**TEXPAR ENERGY, INCORPORATED, a Texas Corporation, Plaintiff–Appellee,**

v.

**MURPHY OIL USA, INCORPORATED, a Delaware Corporation, Defendant–Appellant.**

No. 94–2465.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1994.

Decided Jan. 23, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied April 5, 1995.

Eric J. Van Vugt (argued), John R. Maynard, Mark A. Sanders, Quarles & Brady, Milwaukee, WI, for plaintiff-appellee.

Joseph A. Strubbe, David L. Doyle (argued), Phelan, Pope, Cahill & Devine, Chicago, IL, for defendant-appellant.

Before REAVLEY,* FLAUM, and KANNE, Circuit Judges.

REAVLEY, Circuit Judge.

In this contract dispute, appellant Murphy Oil USA, Inc. complains of the jury charge and the damages awarded to appellee Tex-Par Energy, Inc. Finding no reversible error, we affirm.

* Hon. Thomas M. Reavley, Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.

## BACKGROUND

On May 29, 1992, TexPar contracted to purchase 15,000 tons of asphalt from Murphy at an average price of $53 per ton. On the same day, TexPar contracted to sell the 15,000 tons to Starry Construction Company at an average price of $56 per ton. Hence, TexPar stood to profit by $45,000 if both contracts were performed.

During the first half of 1992, the price of asphalt varied widely. Evidence was presented of prices ranging from $40 to $100 per ton. The wide range of prices reflected volatile market forces. From the supply standpoint, asphalt is one of the end products of petroleum refining, and must be sold or stockpiled to accommodate the production of more valuable petroleum products. Demand depends in large measure on the availability of government funding for highway construction. Weather also affects asphalt supply and demand. The price rose rapidly in June of 1992, and consequently, the sale price of $53 per ton lost its attractiveness to Murphy.

In May and early June TexPar took delivery of 690 tons of asphalt; but, on June 5, Murphy stopped its deliveries and notified TexPar that its sales manager lacked authority to make the contract. By then, the price of asphalt had risen to $80 per ton. Starry insisted that TexPar deliver the full 15,000 tons at $56 per ton as TexPar and Starry had agreed. Ultimately, with TexPar's approval, Starry and Murphy negotiated directly and agreed on a price of $68.50 per ton. This arrangement was reached several weeks after the repudiation by Murphy. By this time the market price had dropped, according to TexPar. TexPar agreed to pay Starry the $12.50 difference between the new price of $68.50 per ton and the original $56 per ton price. TexPar therefore paid Starry approximately $191,000[1] to cover the price difference.

The jury found that the difference between the market price ($80) and the contract price ($53) of the undelivered asphalt (14,310 tons) on the date of repudiation (June 5), amount-ed to $386,370. The court entered judgment for this amount.

## DISCUSSION

The parties agree that Wisconsin law, and particularly Wisconsin's version of the Uniform Commercial Code, applies to this dispute.

### A. *Damages Under UCC § 2–713*

■ The district court applied UCC § 2–713, WIS.STAT.ANN. § 402.713 (West 1994), which provides a measure of the buyer's damages for nondelivery or repudiation:

> Subject to § 402.723 with respect to proof of market price, the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in § 402.715, but less expenses saved in consequence of the seller's breach.

Murphy does not dispute that if this provision is applied, the damages awarded are proper, since Murphy does not dispute the quantity of goods, the market price or the date of notice of repudiation used by the jury to calculate damages. Instead, Murphy argues that the general measure of damages in a breach of contract case is the amount needed to place the plaintiff in as good a position as he would have been if the contract had been performed. Murphy argues that since TexPar's award—$386,370—far exceeds its out-of-pocket expenses ($191,000) and lost profits ($45,000) occasioned by the repudiation, the court erred in instructing the jury merely to find the difference in market price and entering judgment in that amount.

We cannot quarrel with Murphy that the general measure of damages in contract cases is the expectancy or "benefit of the bargain" measure. The UCC itself embraces such a measure in § 1–106, providing that the UCC remedies "shall be liberally administered to the end that the aggrieved party

---

**1.** This figure reflected the $12.50 as well as incidental costs to Starry such as additional sales taxes.

may be put in as good a position as if the other party had fully performed...." Wɪs. Sᴛᴀᴛ.Aɴɴ. § 401.106 (West 1994).

Nevertheless, we do not believe that the district court erred in awarding damages based on a straightforward application of § 402.713. That provision is found in the article on the sale of goods, and specifies a remedy for the circumstances presented here—the seller's nondelivery of goods for which there is a market price at the time of repudiation.

We can see no sound reason for looking to an alternative measure of damages. Murphy argues that TexPar shouldn't be awarded a "windfall" amount in excess of its out-of-pocket damages. Since it depends on the market price on a date after the making of the contract, the remedy under § 402.713 necessarily does not correspond to the buyer's actual losses, barring a coincidence. Our problem with Murphy's suggested measure of damages is that limiting the buyer's damages in cases such as this one to the buyer's out-of-pocket losses could, depending on the market, create a windfall for the seller. If the price of asphalt had fallen back to $56 per ton by the time Starry and Murphy had arranged for replacement asphalt, TexPar's damages would have been zero by this measure,[2] and Murphy could have reaped a windfall by selling at the market price of $80 in early June instead of the $53 price negotiated with TexPar.

█ Murphy argues that it did not in fact realize a windfall, since its cost of production was $70 per ton and it eventually agreed to sell to Starry for $68.50. We find this argument unpersuasive. Applying the market value measure of damages under UCC § 2–713, as the district court did, is expressly allowed under the Code. Since § 2–713 addresses the circumstances of a seller's nondelivery of goods with a market price, we see no error in applying this specific provision over the more general remedies provision

found at § 1–106. *See Tongish v. Thomas,* 251 Kan. 728, 840 P.2d 471, 474 (1992) ("[B]ecause it appears impractical to make [§ 1–106] and [§ 2–713] harmonize in this factual situation, [§ 2–713] should prevail as the more specific statute according to statutory rules of construction."). The UCC § 2–713 remedy serves the purpose of discouraging sellers from repudiating their contracts as the market rises, if the buyer should resell as did TexPar, or gambling that the buyer's damages will be small should the market drop. It also has the advantage of promoting uniformity and predictability in commercial transactions, by fixing damages on the date of the breach, rather than allowing the vicissitudes of the market in the future to determine damages. *Id.* 840 P.2d at 476 ("Damages computed under [§ 2–713] encourage the honoring of contracts and market stability.").[3]

### B. *Other Damages Issues*

█ Murphy argues that the court submitted an erroneous question to the jury regarding cover. Cover is an alternative remedy under UCC § 2–712, which provides that "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller ...," and that "[t]he buyer may recover from the seller as damages the difference between the cost of cover and the contract price...." Wɪs.Sᴛᴀᴛ.Aɴɴ. § 402.712 (West 1994). Murphy argues that TexPar effected cover by arranging for the sale of substitute asphalt by Murphy to Starry.

Murphy requested that the court submit a cover question to the jury, and the court did so, asking the jury: "Did TexPar Energy, Inc. make a reasonable purchase or contract to purchase goods in substitution for those due from Murphy Oil, Inc.?" This question tracks the wording of the statute, and Murphy did not object to its wording. The jury answered "no." This finding is supported by

---

**2.** TexPar would not even have received its lost profits, because Murphy had persuaded the district court that its acknowledgment form effectively precluded the recovery of lost profits. The district court so ruled in granting a partial summary judgment.

**3.** Notwithstanding Murphy's attempt to distinguish the facts of *Tongish,* we find the reasoning in that opinion sound and helpful to our own analysis.

the record. Evidence was presented that although TexPar tried to find substitute asphalt, it was not involved in obtaining or negotiating the agreement eventually reached between Starry and Murphy.

Murphy next argues that the district court should have submitted an instruction on mitigation of damages, since TexPar should have covered and in fact did mitigate damages by agreeing to pay Starry the difference between the Starry's original contract price and the price it eventually obtained from Murphy for replacement asphalt. At bottom, Murphy is simply recasting its arguments, rejected above, that TexPar did in fact cover or that damages should be limited to TexPar's out-of-pocket expenses. We also note that a buyer has no duty to cover under the UCC § 2–712 comment 3 ("The buyer is always free to choose between cover and damages for non-delivery under the next section"). WIS.STAT.ANN. § 402.712 cmt. 3 (West 1964).

■ Murphy also argues that the court should have submitted its requested instruction on "good faith/recoupment," apparently on the theory that TexPar might have directed Starry to negotiate one-on-one with Murphy so that TexPar would not have its damages limited to the cost of cover. We find no merit to this argument. Murphy cites no evidence of devious machinations on the part of a TexPar, a petroleum products sales company, to outflank Murphy with its superior understanding of the intricacies of the UCC. Further, the jury was given an opportunity, in the submitted question on cover, to decide whether the contract between Murphy and Starry was nothing more than a disguised contract between Murphy and TexPar.

■ Finally, Murphy argues that TexPar's damages should be limited to the $191,000 actual loss because TexPar never amended its interrogatory answers. The interrogatory in question sought a description of "each *fact* supporting" TexPar's allegations that it had been "damaged and harmed" by Murphy's conduct. TexPar answered by providing the $191,000 figure representing the amount it had to pay Starry.[4] The interrogatory by its terms did not require TexPar to

identify the legal theory under which it was pursuing damages. Further, TexPar's complaint alleged that it was entitled to "all rights and remedies available under Chapter 402 of the Wisconsin Statutes...." Chapter 402 comprises all of Article Two of the UCC.

### C. *Requested Jury Charge on Mistake*

■ Murphy raises one issue regarding liability, arguing that the court should have instructed the jury on the law of unilateral mistake. There was conflicting evidence on whether the Murphy sales manager was authorized to sell asphalt at the price provided in the contract with TexPar. We see no error here, because the jury's finding that the manager had actual authority to enter into the contract necessarily means that Murphy made no mistake. As a matter of agency law, Murphy is bound by the authorized acts of its servant. *See, e.g., Trible v. Tower Ins. Co.*, 43 Wis.2d 172, 168 N.W.2d 148, 153 (1969). Murphy concedes in its brief that "there may have been sufficient evidence to support the jury's finding that Palmgren had actual authority," and raises no issue that the evidence is insufficient to support this finding or that the jury was incorrectly instructed on actual authority.

AFFIRMED.

---

4. The interrogatory answer also listed other items of no relevance to this appeal.