**CANUSA CORPORATION, Plaintiff,**

v.

**A & R LOBOSCO, INCORPORATED,**
a/k/a A & R Lobosco Company and
Michael Lobosco, Defendants.

Civ. A. No. CV–94–3030(DGT).

United States District Court,
E.D. New York.

Nov. 26, 1997.

Hill Rivkins Loesberg O'Brien Mulroy & Hayden, New York City, for Plaintiff.

Joseph Trotti, Bayside, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

This diversity action for breach of contract raises a surprisingly novel question: what is the effect of an estimate in an output contract when the supplier produces less than the stated estimate? I conclude that New York law would hold that good faith, rather than the stated estimate, would control whether a breach has occurred.

### Background

Plaintiff Canusa seeks damages for lost sales as a result of an alleged breach of contract by defendants Lobosco as well as attorneys' fees in connection with an equipment lease to Lobosco. The case was tried without a jury, where the following facts are found.

Plaintiff Canusa is a Maryland corporation that recycles and brokers waste paper. A & R Lobosco ("Lobosco") is a New York corporation that receives, collects, cleans and resells this recyclable paper to paper mills or brokers like Canusa. Michael Lobosco is A & R Lobosco's president.

In late 1992, Lobosco entered into an agreement with the City of New York to accept 850 tons per week (3,400–3,500 tons per month) of material to be recycled. *See* Trial Tr. (Tr.) at 233; Def.'s Ex. A, "Agreement and Bid Specifications" at B–7. To handle this paper, Lobosco needed a bailer, a piece of equipment to process and bale the recyclable paper. At about the same time, Canusa heard from a third party also in the paper recycling business that Lobosco had obtained a City contract and might be looking for a baler. *See* Tr. at 337–9. Lobosco had put down a deposit on a baler with another firm, but ultimately decided to enter into an arrangement with Canusa because Canusa would finance the baler, while the other arrangement obligated Lobosco to obtain separate financing. *See id.* at 237. Canusa's president, Bruce Fleming, testified that Canusa only enters into baler financing agreements to obtain a steady supply of paper. Fleming testified that Canusa obtains 30% of its paper from contract sources like Lobosco and obtains the balance in the spot

market. Of that 30%, approximately half, or 15% of Canusa's total supply of waste paper comes from agreements similar to the one Canusa had with Lobosco.

Lobosco began receiving recyclables from the City in January of 1993; later that month, Michael Lobosco entered into negotiations with David Knight, a Canusa vice president, for a baler. *See id.* at 236. On March 15, 1993, the parties entered into an Equipment Lease secured by a personal guarantee signed by Michael Lobosco. *See* Pl.'s Ex. 1 ("Equipment Lease"); Pl.'s Ex. 2 ("Personal Guarantee"). Among other things, the Equipment Lease provided that the lessee (Lobosco) would be liable for costs, fees and reasonable attorneys' fees for any action taken to preserve Canusa's rights. *See* Pl.'s Ex. 1, ¶ 14.

The lease also provided that Lobosco was to pay rent, but did not specify an amount. The lease did, however, refer to an "Output Agreement" ("Agreement") that the parties had entered into on March 1, 1993. *See* Tr. at 56. Thus, Lobosco would finance the baler by supplying Canusa with paper, which would then be credited to its account. Michael Lobosco testified that under these agreements Lobosco was to pay $1,551.00/week toward the baler; any amounts of paper sent in excess of that would be credited to Lobosco's account. *See id.* at 240. Michael Lobosco also testified that he was aware that Canusa would resell his paper to third parties. *See id.* at 238.

The Agreement (captioned an "Output Agreement") recited that the parties were entering into an output contract with a five-year term, but it also contained language stating that Lobosco would initially ship 1100 tons per month of number 8 quality old news print (ONP 8)[1] per month to Canusa in 1993, and 1500 tons per month thereafter (1994–97). Both parties presented evidence that they understood this number to mean the minimum number of tons Lobosco was obli-

gated to provide to Canusa. *See* Tr. at 123, 241. The Agreement also provided that the price per ton of ONP would be set each month between the parties and defined acceptable ONP. Fleming described ONP 8 as "anything that normally comes in a household newspaper." Tr. at 36. Materials that have no relationship to paper, such as garbage, masonry, metal, etc., are called prohibitives. Materials that are acceptable in small amounts are called outthrows. Examples of outthrows include Sunday newspaper magazines and coupon circulars. *See id.* Some paper products, most notably telephone books, are also considered prohibitives. The Agreement specified that no prohibited materials would be accepted, and that total outthrows could not exceed one quarter of one percent (.25%) by weight. *See* Pl.'s Ex. 3 ¶ 8. The Equipment Lease and Guarantee provided for the application of Maryland law, while the Agreement provided for the application of New York law.

From the beginning, the relationship was a rocky one. Canusa provided documentation demonstrating the actual tons of material shipped to it from 1993 into May 1994, Lobosco's last shipment date.[2] Only in the very first month of the contract, April 1993, did Lobosco come close to the estimate in the Agreement, shipping 942 tons. Michael Lobosco gave several reasons for his firm's inability to meet the schedule set in the Agreement. First, he stated that the materials from the City had a much higher proportion of garbage than what he had previously obtained from similar programs in the suburbs. *See* Tr. at 245. Second, he noted that he did not always get the amount promised under the City contract. *See id.* He also testified, without contradiction, that of the material he received from the City, ultimately 28% was convertible into ONP 8. Michael Lobosco derived this figure as follows: he testified that 30% of each load from the City consisted of prohibitives such as garbage,

---

**1.** The Agreement defined ONP 8 as "Tare free, sorted, fresh dry pre-consumer or post-consumer newspaper, free from magazines and paper other than newsprint.... Prohibited materials are not permitted and total outthrows may not exceed one quarter of one percent (.25%)." Prohibited materials included, in addition to non-paper ma-

terial, "gift wrap, windowed envelopes, carbon paper, fax paper, hardcover books, telephone books, paper bags, ... [and] cardboard...." Agreement ¶ 8.

**2.** See Appendix for a listing of tons shipped.

thus leaving 70% of the initial amount. Of this remainder, Lobosco estimated that 40% of it was ONP 8. *See id.* at 266. During this time, Lobosco also received about 150 tons per month of newspaper from other sources. *See id.* at 292.

At the same time Lobosco was not meeting the specification of the Agreement, it was shipping another paper product to Mandala Recycling. *See* Tr. at 265; Pl.'s Exs. 15, 29–32. Lobosco testified that this product contained "50–60%" newspaper. *See* Tr. at 265. There was no direct testimony by the buyer or the seller as to the outthrow content of this proprietary package, which was to be sent overseas, but the principal of Mandala, Stephen Batty, testified that he was allowed "a little more latitude" in the material that he shipped to Indonesia. *See id.* at 223.[3]

Beginning in September 1993, after a series of attempts to have Lobosco's output conform to ONP 8, Canusa offered to modify the Agreement. Specifically, Canusa offered to accept 500 tons per month of ONP 7/8 (also known as "export news") instead of the higher quality ONP 8. *See* Ex. 49–A, (Ltr. from David Knight to Mike Lobosco dated December 13, 1993); Ex. 49–B (Ltr. from David Knight to Ken Knigan of Lobosco dated September 13, 1993). Michael Lobosco never signed this agreement; however, he testified that he acted pursuant to his understanding of it. *See* Tr. at 261. Lobosco also testified that he told Knight not to ship this product to a newsprint mill because it would be rejected, but that Knight went ahead and did so. *See id.* Knight's testimony was similar, except that Knight stated that the material was rejected because it had rotted due to moisture. *See id.* at 146, 157–8. In the month following this amendment (October, 1993), the amount of paper Lobosco shipped to Canusa almost doubled.

Although Lobosco had shipped 440 tons in January of 1994, that number decreased to 270 in February and zero in March. In January 1994, Canusa offered to accept a "baler fee" payment of $3.00 per ton, relieving Lobosco of any obligation under the Agreement. *See* Pl.'s Ex. 50 (Ltr. from Canusa to Lobosco dated January 25, 1994). In March 1994, Canusa again offered to modify the Agreement. Lobosco would pay, in addition to the regular baler payment, $3,000.00 per month. This amount was computed on the basis of a $2 per ton profit on the 1500 tons that Lobosco was to have shipped to Canusa. In return, Canusa would release Lobosco from its obligation under the Output Agreement. *See* Pl.'s Ex. 52 (Ltr. from Canusa to Lobosco dated March 30, 1994). Lobosco never accepted this proposal. *See* Tr. at 51–2. Canusa filed its complaint on June 27, 1994.

Canusa sought damages for breach of contract, fraudulent inducement, and replevin of the baler. The parties entered into a stipulation of partial settlement on June 30, 1994, which provided that Lobosco would purchase the baler from Canusa, settling the replevin and rent claims, but that Canusa reserved all of its other rights under the Equipment Lease, guarantee, and Agreement. *See* Pl.'s Ex. 4 (Stipulation of Partial Settlement) At trial, Canusa's fraudulent inducement claim was dismissed; thus, only the action for breach of contract under the Agreement and fees and costs associated with the replevin action remain to be decided.

## Discussion

### A. Breach

■ In this diversity action, the parties do not dispute that New York law governs the question of breach of the Agreement, while Maryland law governs the Equipment Lease and Guarantee. Under New York law, because the Agreement is a contract for the sale of goods, it is governed by New York's version of the Uniform Commercial Code ("UCC").

---

3. Canusa argues that the material sold to Mandala should be considered as the equivalent of ONP 8 even though Canusa admits that its outthrow content may have exceeded the requirements for ONP 8 by a considerable margin (10% versus .25%). In support of this argument, Canusa produced evidence from an inspection firm (SGS) which certified to the destination country (Indonesia) that the bales sold to Mandala and shipped from Lobosco's premises were exportable recycled paper. *See* Tr. at 310–33. For reasons explained in the "Damages" section of this opinion, *infra* at 733, Canusa is not entitled to damages based upon Lobosco's sales to Mandala.

Canusa contends that Lobosco breached its contract by failing to meet the minimum set forth in the Agreement. Lobosco contends that there was no breach because it supplied Canusa with all the ONP 8 that it produced. The initial dispute, then, is over the meaning of an estimate in an output contract. Canusa argues that under the Agreement it is entitled to the minimum tonnage specified, while Lobosco argues that output agreements like this one are subject only to the requirement of good faith. Significantly, Canusa did not offer any evidence to prove, nor advance the theory at trial, that this contract was a fixed quantity contract; indeed, it would be difficult to do so given the document itself. In fact, Knight testified at trial that Canusa subsequently changed its contracts to supply contracts to ensure that it would receive a specified amount. *See* Tr. at 167–9; Def.'s Ex. F. Thus, there is no dispute that the Agreement is an output contract; the issue is what weight should be given to the Agreement's estimate.

Output contracts are governed by § 2–306, which provides in part:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

N.Y.U.C.C. § 2–306(1) (McKinney 1993). Prior to the introduction of the UCC, estimates in output contracts were just that: estimates. *See Orange and Rockland Utils., Inc. v. Amerada Hess Corp.*, 59 A.D.2d 110, 115, 397 N.Y.S.2d 814 (2d Dep't 1977). Comment 3 to § 2–306 provides: "Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur." N.Y.U.C.C. § 2–306, cmt. 3 (McKinney 1993). In contrast, comment 2 states: "The essential test is whether the party is acting in good faith." *Id.*, cmt. 2. Taken together,

these comments do not provide much guidance as to the importance of the estimate in a reduced output context, because the weight given an estimate in an output or requirement contract usually only becomes an issue in the context of an increase, either in the seller's output or in the buyer's demand. The former case is illustrated by *Philadelphia Corp. v. Niagara Mohawk Power Corp.*, 207 A.D.2d 176, 621 N.Y.S.2d 237 (3d Dep't 1995). There, the court held that the plaintiffs, who sought to increase their electrical output, could not "increase their electrical output beyond the reasonable expectations of the parties as quantified by the stated estimates." *Id.* at 179, 621 N.Y.S.2d 237 (citation and footnote omitted). In *Orange and Rockland Utilities*, the court held that in a rising market the doubling of an estimated demand for fuel oil under a fixed price contract was unreasonably disproportionate. *See* 59 A.D.2d at 115, 397 N.Y.S.2d 814.

Because these decisions do not address the concerns that arise in the specific factual context of this case they are inapposite. Three cases do, however, shed light on this issue. The first, a leading case in New York, is *Feld v. Henry S. Levy & Sons, Inc.*, 37 N.Y.2d 466, 373 N.Y.S.2d 102, 335 N.E.2d 320 (N.Y.1975). In *Feld*, plaintiff entered into a contract to purchase all of the output of the defendant seller's bread crumbs. Defendant stopped production of bread crumbs after several months of production, and dismantled the equipment for making them. Defendant argued that its total cessation of production ended its duty under the contract. The reason given for the cessation was that it was no longer economically feasible for the firm to produce the product. The court noted that "good faith cessation of production terminates any further obligations thereunder and excuses further performance by the party discontinuing production," *id.* at 470–71, 373 N.Y.S.2d 102, 335 N.E.2d 320 (citations omitted), and that while an imperiling of defendant's business might warrant cessation, the fact of a lesser return than expected on the contract would not. Thus, although there was no estimate in the contract, the court held that the only appropriate test was one of good faith. The court did not discuss the issue of disproportionate variation.

The second relevant case is *Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333 (7th Cir.1988). In *Empire Gas,* the parties entered into a requirements contract to convert several thousand of defendant's vehicles to gas; the defendant never converted a single vehicle under the contract. On appeal, the defendant contended it was error for the trial judge to read § 2–306 verbatim to the jury, because the "unreasonably disproportionate" language, without explanation, might effectively have produced a directed verdict for plaintiff, since taking nothing under the contract could easily be "unreasonably disproportionate." Writing for the court, Judge Posner held that when a buyer takes less, rather than more than the stated estimate in a requirements contract, the unreasonably disproportionate provision of § 2–306 does not apply, and the sole test is good faith. *See id.* at 1339. Thus, a buyer could reduce his or her requirements to zero under a requirements contract, provided that he or she did so in good faith. *See id.* at 1338.

The court began its analysis of the disproportionate proviso by noting that case law distinguishes between overdemanding and underdemanding cases, and that at common law the sole test of underdemanding was good faith. *See id.* at 1337 (citing cases) The court then read the statute to mean that the "unreasonably disproportionate" language as providing a specific articulation of good faith, the general standard, in the context of an overdemanding case. *See id.* at 1338. Thus, the "unreasonably disproportionate" language of § 2–306(1) has no application in the context of an underdemanding case.

At least one circuit court has adopted the reasoning of *Empire Gas* in a factual setting similar to this case. In *Atlantic Track & Turnout Co. v. Perini Corp.,* 989 F.2d 541 (1st Cir.1993), Perini had contracted to remove material as part of a railroad track rehabilitation project, and then sought to sell this material to Atlantic Track. Perini supplied on 15% of the material estimated in Atlantic Track's purchase orders because the rehabilitation contract was modified and then terminated, and because some of the material from the project was contaminated and apparently unusable. Atlantic Track argued that under § 2–306, Perini was obligated to provide material in conformity with the estimates in plaintiff's purchase orders, which also stated that Perini was to furnish "all available material." *Id.* at 542–43. Rejecting this argument, the First Circuit held that the unreasonably disproportionate language of § 2–306 does not apply to an output contract where the seller tenders less than the estimate, and that the sole test in this context is good faith. *See id.* at 544–45. In reaching its conclusion, the court first adopted the reasoning in *Empire Gas* that the "unreasonably disproportionate" language represented a specified articulation of good faith, and that a requirements contract "represents a risk allocation." *Id.* at 544 (citing *Empire Gas,* 840 F.2d at 1340). Interpreting Massachusetts law, the court went on to hold that the risk allocation rationale articulated in *Empire Gas* "supports different treatment of cases such as the present one, in which the seller in an output contract tenders less than the stated estimate, from cases in which the seller tenders more." *Atlantic Track,* 989 F.2d at 545 (citation omitted). Here, "the output contract allocates to the buyer the risk of a change in the seller's business that makes continuation costly, while the seller assumes the risk of a less urgent change in circumstances." *Id.*

Although *Atlantic Track* is not controlling and although neither *Feld* nor *Empire Gas* is directly on point, the reasoning of these three cases is compelling here. First, as the *Feld* court noted, good faith is the general standard by which output contracts are measured. *See Feld,* 37 N.Y.2d at 470, 373 N.Y.S.2d 102, 335 N.E.2d 320. Second, as the *Empire Gas* court found, the "unreasonably disproportionate" language in § 2–306 is a specific construction of good faith in the context of increased output or demand, and has no relationship to a good faith analysis of a decrease. *See Empire Gas,* 840 F.2d at 1338. In a requirements contract, the seller takes the risk that the buyer may in good faith reduce its requirements to zero. *See id.* Given the premise that a seller will want to maximize its output, the good faith standard provides a sufficient test to measure a reducing seller's performance against. *See*

**730**

*HML Corp. v. General Foods Corp.*, 365 F.2d 77, 81 (3rd Cir.1966) (applying New York law). So too, in an output contract, the buyer takes the risk that the seller may reduce its production to zero. *See Feld*, 37 N.Y.2d at 470–71, 373 N.Y.S.2d 102, 335 N.E.2d 320. Applying good faith rather than an estimate does not give the seller an unbargained for advantage; rather, it merely preserves the essential character of contracts that lack a fixed term, albeit through the somewhat elusive concept of good faith. *See Empire Gas*, 840 F.2d at 1339 (calling good faith a "chameleon"); *see also Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 612–15 (2d Cir.1979) (Friendly, J.) (discussing a "best efforts" clause under New York law and noting at n. 7 that "the New York law is far from clear.").[4]

■ Moreover, a mechanical adherence to the estimate in the contract would essentially convert all output contracts with an estimate into fixed contracts. The fallacy of this proposition is illustrated by this case: having bargained for the flexibility of an output contract, Canusa now seeks to treat it as a fixed goods contract. An output agreement is not transformed into a fixed quantity contract by the insertion of an estimate. Thus, where an output contract provides for a certain amount of goods to be produced,

the appropriate test for a seller's reduction in output is good faith rather than the estimate in the contract.[5]

■ After discounting the estimate in the Agreement as the appropriate yardstick, the baseline for the defendant's good faith must be set at Michael Lobosco's own estimate of the ONP 8 he could produce from the City's material, because Canusa failed to establish any other basis. Despite being given the opportunity, Canusa did not offer *any* evidence of other percentages of ONP production from *any* city's recycling program. Measured by its own standard, however, Lobosco's performance does not comport with good faith. When asked why he failed to produce ONP 8 in quantities consistent with his own production estimate, Michael Lobosco's only explanation was that it would have taken more time to sort the material. *See* Tr. at 298. The fact that it would cost more to clean the material to reach the ONP 8 standard does not demonstrate good faith; nor does it provide an excuse, *see Feld*, 37 N.Y.2d at 471–72, 373 N.Y.S.2d 102, 335 N.E.2d 320, especially where there is no showing that the additional costs would not have made the contract unprofitable. Thus, because Lobosco failed to supply the ONP 8 that its president testified it could produce, it

---

**4.** Section 1–203 of the UCC states: "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." (McKinney 1993). Section 2–103(1)(b) states: " 'Good faith' in the case of a merchant [§ 2–104] means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." (McKinney 1993). Here, both parties are merchants within the meaning of the UCC. *See* N.Y.U.C.C. § 2–104(1) (McKinney 1993).

**5.** An alternative analysis under common law principles of contract law would reach the same result. As a matter of law, the contract is ambiguous because there is more than one reasonable reading of it. *See Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (N.Y.1978). Although the parties to a contract "may not create an ambiguity merely by urging conflicting interpretations of their agreement....if ambiguity exists, then extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language." *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d 1091,

1095 (2d Cir.1993) (citations omitted) (construing New York law); *see also John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 461 (2d Cir.1994). Moreover, this Agreement does not contain a merger clause. Therefore, extrinsic evidence is admissible as an aid to interpretation.

Testimony taken at the trial clearly demonstrated that the figure placed in the Agreement was based solely on the figure from the City contract. *See* Tr. at 240–41. Furthermore, Michael Lobosco testified that although he gave Knight the tonnage figure from Lobosco's contract with the City, it was Canusa that specified the tonnage figures in the Agreement. In this context, the pertinent interpretive principle is the rule that "[i]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language." *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 489 N.E.2d 1283 (N.Y. 1985) (citation omitted). As a result, the estimate in the Agreement cannot be seen as controlling.

breached the Output Agreement.[6]

■ Lobosco did not raise the defense of waiver at trial. Even if it had, Canusa's efforts to work with Lobosco is not a waiver of the good faith requirement, because a party need not terminate the contract, but may instead seek to resolve the problem. *See Horn Waterproofing Corp. v. Bushwick Iron & Steel Co., Inc.*, 66 N.Y.2d 321, 326–31, 497 N.Y.S.2d 310, 488 N.E.2d 56 (N.Y.1985) (holding that UCC § 1–207 permitted the reservation of rights by a creditor who endorsed defendant's check). Indeed, as a matter of policy, the law ought to encourage Canusa's attempt to avoid litigation.[7]

■ The only issue remaining is at what point can it be said that Lobosco breached the contract. Although an earlier date can be supported by the record, it would appear that as late as October, 1993, Lobosco was seeking to resolve his differences with Canusa. In that month, he sent substantially more than the minimum requirement and double the previous month. In November, shipment began to deteriorate again, never

to recover. Therefore, the breach can fairly be ascribed as occurring in November, 1993, and damages will be calculated from that date.

## B. Damages

■ Canusa contends that under the UCC it is entitled to damages for the loss of profits it could have had, had it received Lobosco's ONP 8. *See Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (N.Y.1986) ("Loss of future profits as damages for breach of contract have been permitted in New York under long-established and precise rules of law."). When the aggrieved buyer is in the business of reselling the breaching seller's goods, the buyer may recover the lost profits as consequential damages. Section 2–713(1) states: "[T]he measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with

---

**6.** As a result, there is no need to reach Lobosco's impossibility defense, because impossibility is merely a "[p]articular application[ ]" of good faith. N.Y.U.C.C. § 1–203, cmt. (McKinney 1997); *see also* § 2–615, cmt. 6; § 2–615, cmt. 11 ("An excused seller must fulfill his contract to the extent which the supervening contingency permits....."). In any event, Lobosco has not demonstrated that its performance is commercially impracticable within the meaning of § 2–615. Section 2–615 requires a breaching seller to show (1) a contingency (2) the impracticability of performance as a consequence of the occurrence of that contingency, and (3) that the nonoccurrence of the contingency was a basic assumption of the contract. *See Luria Bros. & Co., Inc. v. Pielet Bros. Scrap Iron & Metal, Inc.*, 600 F.2d 103, 111–12 (7th Cir.1979) (citation omitted). Here, Lobosco has not demonstrated that, even if the Agreement was premised on the contract with the City, that it fulfilled its duty to assure itself that it had no other means available for fulfilling the Agreement. *See id.* at 112 (holding that breaching seller of scrap metal who may have premised contract on a particular source was not excused by failure of that source where seller failed to show that the product was not otherwise available) (citing § 2–615, cmt. 5). Nor has Lobosco demonstrated that this event was an unforeseeable contingency not contemplated at the time of contracting. *See Bende and Sons, Inc. v. Crown Recreation, Inc. Kiffe Prods. Div.*, 548 F.Supp. 1018, 1022 (E.D.N.Y.1982) (holding that train derailment resulting in total loss of shipment is not an unforeseeable contin-

gency within the meaning of § 2–615). Finally, increased cost of performance is not a basis for excuse under § 2–615. *See Louisiana Power & Light Co. v. Allegheny Ludlum Inds., Inc.*, 517 F.Supp. 1319, 1323–26 (E.D.La.1981) (discussing § 2–615 in a case applying New York law and noting (at 1324) that: "The mere fact that performance under the contract would have deprived Allegheny of its anticipated profit and resulted in a loss on the contract is not sufficient to show commercial impracticability.").

**7.** Section 1–207 of the UCC provides: "A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved." (McKinney 1997). New York's own commentary on this section is illuminating: "This section permits a party involved in a Code-covered transaction to accept whatever he can get by way of payment, performance, etc., without losing his rights to demand the remainder of the goods, to set-off a failure of quality, or to sue for the balance of the payment, so long as he explicitly reserves his rights." N.Y.U.C.C. § 1–207, N.Y. Annot. (McKinney 1997); *see also Horn*, 66 N.Y.2d at 328, 497 N.Y.S.2d 310, 488 N.E.2d 56 (discussing this Annotation). Lobosco presented no evidence that Canusa either failed to reserve or otherwise waived its contractual rights.

any incidental and consequential damages provided in [§ 2–715], but less expenses saved in consequence of the seller's breach." N.Y.U.C.C. § 2–713(1) (McKinney 1993). Section 2–715, in turn, provides in subsection 2 that: "Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." N.Y.U.C.C. § 2–715(2)(a) (McKinney 1993). Comment 6 to § 2–715 provides: "In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know within the meaning of subsection (2)(a)." N.Y.U.C.C. § 2–715(2)(a), cmt. 2. Thus, consequential damages for lost profits are recoverable where the buyer is a reseller or a broker, which Canusa is. *See Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1063 (S.D.N.Y.1996) (citing cases), *aff'd* 108 F.3d 1369, 1997 WL 138112 (2d Cir.1997); *Bende & Sons, Inc. v. Crown Recreation, Inc., Kiffe Prods. Div.,* 548 F.Supp. 1018, 1022 (E.D.N.Y.1982); *Harbor Hill Lithographing Corp. v. Dittler Bros., Inc.,* 76 Misc.2d 145, 146, 348 N.Y.S.2d 920 (Sup.1973); 1 Robert C. Dunn, *Recovery of Damages for Lost Profits* §§ 2.3–2.4 (1992) (citing cases)

Lobosco argues that because Canusa covered its contractual obligations to its purchasers, it has no damages. This argument must be rejected for three reasons. First, although neither § 2–713 or § 2–715 speaks in terms of "lost profits," as noted above, in the case of a buyer-reseller or broker, lost profits are available as consequential damages. Second, the general objective of the damages provisions in the UCC is to put the aggrieved party "in as good a position as if the other party had fully performed...." N.Y.U.C.C. § 1–106(1) (McKinney 1993). Canusa provided evidence in the form of testimony that it could have sold all the

material Lobosco produced in addition to any cover that Canusa obtained. *See* Tr. at 65. Lobosco does not contest that there was a viable market for ONP 8; therefore, the fact that Canusa sold all the ONP 8 it acquired does not bar it from recovering damages for the *loss* of the ONP 8 it could have sold if it was obtainable. In *Apex Oil Co. v. Vanguard Oil & Service Co., Inc.,* 760 F.2d 417 (2d Cir.1985), the Second Circuit held that a buyer-broker could recover damages under § 2–713 even where the buyer-broker did not prove that it had a customer for the oil that it was to have received from the breaching seller. *See id.* at 424. Here, Canusa has provided substantial evidence in the form of testimony of a rising market in the relevant period, and that it could have sold all the material Lobosco produced, in addition to the cover that it obtained. Finally, Lobosco's argument is contrary to the language of the damages provisions of § 2–713, which do not limit a buyer-reseller's damages to situations where the buyer could not cover. The reason for this is straightforward: under Lobosco's approach, a breaching seller would never be liable for any lost profit damages when it breached a contract in a rising market so long as cover could be effected. *See* 1 Roy R. Anderson, *Damages Under the Uniform Commercial Code,* § 8:23 (1988); *cf. TexPar Energy, Inc. v. Murphy Oil USA, Inc.,* 45 F.3d 1111, 1114 (7th Cir.1995); *Apex,* 760 F.2d at 424. Thus, Canusa's effecting cover does not bar it from seeking damages, but is better seen as an effort to fix its damages.[8]

To recover damages in New York a plaintiff must prove "causation, foreseeability, [and] certainty (reasonable or less)." *Coastal Aviation,* 937 F.Supp. at 1064. The defendant has the burden of demonstrating a failure to mitigate damages. *See id.* To show causation, "it must be demonstrated with certainty that such damages have been caused by the breach...." *Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234. Canusa showed that because of Lobosco's breach, it experienced a shortfall in profits. *See* Tr.

---

8. The parties discuss at length *R.E. Davis Chemical Corp. v. Diasonics, Inc.,* 924 F.2d 709 (7th Cir.1991). Although the principle of recovery under a "lost volume" theory pursuant to § 2–708(2) is analogous to the issue of lost profits presented here, § 2–708 is not applicable because Canusa brought this action as a buyer-reseller not a seller and, thus, cannot avail itself of a remedy under § 2–708, but must rely on the remedies afforded by § 2–713 and § 2–715.

at 65; Pl.'s Ex. 69. As to foreseeability, the second element, as noted above, Lobosco testified that he was aware that Canusa was a buyer-broker, and that the ONP 8 would be resold to third parties. *See* Tr. at 238. Thus, Lobosco had reason to know of Canusa's consequential damages within the meaning of § 2–715.

Finally, "the alleged loss must be capable of proof with reasonable certainty." *Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234. Here, rather than relying on proof via market price, Canusa has submitted evidence of its average gross profit on paper sales for the first three and a half years of the contract as $4.1349 (U.S.) per ton. Canusa also submitted a contract with a Canadian paper mill to show both a (slightly lower) resale profit as well as the existence of a buyer for the ONP 8 that Canusa obtained. *See* Pl.'s Ex. 14. The average figure is more appropriate than the fixed return on the tonnage shipped to the mill because ONP 8 is a fungible commodity and there is no evidence that the mill's contract with Canusa was incorporated into the Agreement. Evidence of gross profit was introduced through the testimony of William Mullen, Canusa's Chief Financial Officer. Through Mullen, Canusa also introduced reports showing the total tonnage Canusa accepted from Lobosco. *See* Tr. at 200–2; Pl.'s Ex. 69. Mullen also testified concerning Pl.'s Ex. 17, Canusa's grade profitability reports, which showed Canusa's gross profit on its ONP sales; i.e., the selling price less cost of goods sold, transportation, and any other associated costs excluding general overhead. *See* Tr. at 188–93. Fixed costs (overhead) are not included in the damages computation because Canusa would have incurred these costs regardless of Lobosco's breach. *See Adams v. Lindblad Travel, Inc.,* 730 F.2d 89, 93 (2d Cir.1984). Consequently, Canusa's gross profit figures are sufficiently certain to base an award of damages upon.

■ Canusa devoted much energy to producing receipts from Mandala Recycling and SGS, an inspection firm, to show that Lobosco actually sold far more material to Mandala than it otherwise accounted for. Canusa argues that by looking at this evidence, it is clear that Lobosco could have met the stated minimum. While this argument is relevant on the issue of whether Lobosco has acted in good faith or breached the contract, Lobosco's sales to Mandala are irrelevant to Canusa's damages. First, Canusa was unable to show that the material sold to Mandala was ONP 8 or close to it. At trial, both an official and a field employee of SGS testified as to SGS's inspection procedure, but neither witness testified that the inspected bales consisted of ONP 8 as defined in the Agreement. *See* Tr. at 320–23; 332–33. Mandala's president, Steven Batty, refused to state what the content of the export bales was, except to ·state that they contained a higher percentage of outthrows than ONP 8. *See id.* at 223. Lobosco argued, without contradiction, that even if the outthrow proportion of this export material could be established, that the tonnage figures for material shipped to Mandala could not be related to the tonnage shipped to Canusa because outthrows are denser than newspaper. *See id.* at 275, 369. Second, Canusa, in any case, is not entitled to Lobosco's profit on its sales to Mandala for a more important reason. Canusa's agreement was not an exclusive contract. Lobosco was not prohibited from selling non-ONP 8 material to third parties provided it in good faith sought to meet its obligation to Canusa. Consequently, Canusa did not establish for the purposes of computing damages that the material sold to Mandala by Lobosco should be included in the damages calculation.

Canusa is, however, entitled to the damages it incurred as a result of Lobosco's failure to perform the contract in good faith. If Lobosco had done so, Canusa would have at a minimum received as ONP 8 28% of the tonnage the City delivered to Lobosco. Additionally, Canusa is entitled to rely on the fact that Michael Lobosco stated that he had other sources of paper. At trial, he testified that these sources produced another 150 tons per month of ONP 8.

Canusa claims damages through the remaining period of the contract. Canusa is entitled to judgment against A & R Lobosco in an amount equal to 28% of the City's tonnage plus 150 tons per month times its

gross profit over the term of the contract, starting in November, 1993.[9]

## C.  Attorney's Fees

■ Canusa also seeks recovery of fees expended on the replevin action for the baler. Lobosco argues that Canusa is not entitled to attorney's fees because there was no failure to pay rent under the lease.  This argument is grounded in the assertion that Lobosco never sent a check for rent to Canusa.  Because of the relationship between the Agreement and the lease, this argument is dubious at best.  It is unnecessary to consider it, however, because the lease gives Canusa the right to bring an action upon a default under the Agreement.  *See* Pl.'s Ex. 1 ¶ 14.  Canusa is thus-entitled to recover fees as provided for by Maryland law.

■ Under Maryland law, attorney's fees may be awarded to the prevailing litigant when they are provided for in a contract.  *See Maxima Corp. v. 6933 Arlington Development Ltd. Partnership,* 100 Md.App. 441, 641 A.2d 977, 982 (1994) (citing cases). The party seeking fees and expenses must prove them " 'with the certainty and under the standards ordinarily applicable for proof of contractual damages.' "  *Id.* (quoting *Bankers and Shippers Ins. Co. v. Electro Enter., Inc.,* 287 Md. 641, 415 A.2d 278 (1980)).  In addition to proving the fees, a litigant must present sufficient evidence to the court to enable it to determine that the fees are reasonable.  *See Maxima,* 641 A.2d at 983.  Once the litigant has presented sufficient evidence for the court to determine the reasonableness of the fees sought, the court must then determine if the fee is in fact reasonable.  *See id.* (citing cases)  Finally, fees may be recovered only to the extent that they are the product of efforts to enforce the contract that provides for fees.  *See Reisterstown Plaza Assocs. v. General Nutrition Center, Inc.,* 89 Md.App. 232, 597 A.2d 1049, 1055 (1991).  Put differently, claims that arise out of the same transaction are recoverable where they "require[ ] proof or denial of essentially the same facts."  *Id.* 597 A.2d at 1056.

■ Canusa submitted sufficient evidence in the form of bills and testimony to support an award of fees.  Canusa submitted bills documenting the specific work and the number of hours billed by Niles, Barton, its counsel in Baltimore and by Hill, Rivkins, its counsel in this area.  *See* Pl.'s Ex. 7A (invoice from Hill, Rivkins for $18,145.00); Pl.'s Ex. 7 (revised invoice from Hill, Rivkins for $16,388.01); Pl.'s Ex. 10 (invoice from Niles, Barton for $2,000.21).  Canusa also produced testimony supporting these invoices from the Hill, Rivkins lawyer who had performed the work.  *See* Tr. at 101–05.  First, under Maryland law, the fees are not unreasonably disproportionate as a matter of law.  *See Reisterstown,* 597 A.2d at 1057 (holding that award of $141,784.42 to cross-claiming defendant for fees where damage award to defendant totalled $79,337.91 and plaintiff had sought $225,000.00 not unreasonable as a matter of law).  Second, the actual costs charged are reasonable.  Factors considered in finding reasonableness include " '(1) the time and labor required . . . (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained. . . .' "  *Reisterstown,* 597 A.2d at 1056–57 (quoting Rule 1.5(a) of Rules of Professional Conduct).  Here, the two firms performed work in connection with the replevin action that included research and drafting of the complaint and an Order to Show Cause, negotiations with Lobosco's counsel, and court appearances that, together, produced the partial settlement.  Of the 95.05 hours Hill, Rivkins charged, almost 75 of them were billed at $175.00 per hour, while the balance were billed at $250.00 per hour.  The total time (less than 100 hours) is reasonable, and the rates charged are comparable to those charged in the New York City area.  Although Canusa did not furnish information on the prevailing rates of lawyers in Baltimore, it should be noted that the rates charged are significantly lower than those in New York; the fact that Canusa's Baltimore counsel spent less than fifteen hours on the replevin action is clearly reasonable.  Moreover, in light of the total amount involved (the baler was sold to Lobosco for $294,-

---

**9.**  For the calculation of the damages, see Appendix.

548.55), the total legal expenses are reasonable and recoverable under Maryland law. Finally, the fact that some portion of the bills represents time spent drafting the complaint for breach of the Agreement does not bar Canusa from recovery of its expenses. The replevin action was brought under the lease, but was ultimately predicated upon the breach of the Agreement; to the extent that Canusa incurred expenses relative to the action for breach, these expenses are sufficiently intertwined to permit recovery for the total. *See Reisterstown* at 1056 (holding that in action for rent, tenant's counterclaims including negligence "arose out of the same transaction"). Similarly, both the bill to Canusa for videotaping the baler in operation prior to the settlement, *see* Pl.'s Ex. 9 (invoice for $875.00 from Ottaway & Van Hemen), and the opinion rendered on the tax consequences of the sale of the baler after the settlement had been reached, *see* Pl.'s Ex. 9 (invoice for $875.00 from Fasciana and Associates) are recoverable as related expenses. Therefore, Canusa is entitled to judgment against A & R Lobosco, Incorporated and Michael Lobosco in the amount of $20,138.22 for fees and expenses.

### Conclusion

By failing to produce all the ONP 8 that it admitted it could have produced, Lobosco breached its output contract with Canusa. Canusa is entitled to damages under the UCC consistent with what Lobosco's good faith production would have yielded. Additionally, under the Equipment Lease, Canusa is entitled to attorneys' fees and costs for the action to replevin the baler. Judgment to be entered against A & R Lobosco, Incorporated, in the amount $125,597.59 (see Appendix). Judgment to be entered against A & R Lobosco, Incorporated and Michael Lobosco in the amount $20,138.22. The Clerk of the Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

*Canusa v. A & R Lobosco,* CV–94–3030

*Appendix*

| 1. Month | 2. Tonnage sent to Lobosco as reflected on Lobosco invoices to City (Pl. Exs. 19-24) | 3. Lobosco's production estimate plus non-City sources (28% of Col. (2) Plus 150 tons)[1] | 4. Tons of ONP 8 delivered to Canusa (Pl. Ex. 13) | 5. Difference between amount delivered and Lobosco's production estimate (Col. (3) minus Col. (4)) | 6. Canusa's Lost (Col. (5) × $4.1349 (average profit/ton))* |
|---|---|---|---|---|---|
| 11/93 | 1451 | 556 | 403 | 153 | $ 633 |
| 12/93 | 1499 | 570 | 348 | 222 | 918 |
| 1/94 | 1057 | 446 | 444 | 2 | 8 |
| 2/94 | 561 | 307 | 270 | 37 | 153 |
| 3/94 | 1942 | 694 | 0 | 694 | 2,870 |
| 4/94 | 1674 | 619 | 186 | 433 | 1,790 |
| 5/94 | 2037 | 720 | 79 | 641 | 2,650 |
| 6/94 | 1928 | 690 | 0 | 690 | 2,853 |
| 7/94 | 1687 | 622 | 0 | 622 | 2,572 |
| 8/94 | 1672 | 618 | 0 | 618 | 2,555 |
| 9/94 | 1760 | 643 | 0 | 643 | 2,659 |
| 10/94 | 1707 | 628 | 0 | 628 | 2,597 |
| 11/94 | 1807 | 656 | 0 | 656 | 2,712 |
| 12/94–2/98 | 1700[2] | 626 | 0 | 24,414 | 100,949 |
| | | | | Total: | $125,920 |

1. Rounded to the nearest whole dollar.

2. The City's shipments to Lobosco apparently stabilized at approximately 1,700 tons per month after July 1994. Therefore, Canusa's damages for the 39 months remaining on the contract will be figured on the basis of 1,700 tons per month.