In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 07-3364

NYCOMED US INC.,

*Plaintiff-Appellant,*

*v.*

ABBOTT LABORATORIES,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04-C-4807—**Virginia M. Kendall**, *Judge.*

_____

ARGUED APRIL 16, 2008—DECIDED SEPTEMBER 8, 2008

_____

Before EASTERBROOK, *Chief Judge*, and WOOD and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Nycomed US Inc. (to which we refer as "Altana," its name at the time of this suit) manufactures and sells erythromycin ophthalmic ointment, which is used to prevent and treat eye infections. To manufacture the ointment, Altana uses erythromycin powder supplied by defendant Abbott Laboratories ("Abbott"). On one occasion, Abbott supplied to Altana

a batch of defective erythromycin. Under the supervision of the Food and Drug Administration, Abbott promptly notified Altana of the problem; Altana in turn had to recall and destroy over 1.2 million tubes of its ointment. Faced with this unexpected setback, Altana put its facility into overdrive in order to make a replacement batch of ointment while not falling behind on its regular manufacturing schedule. Altana's employees worked overtime; personnel moved from other departments into the ointment department to provide extra hands; and the extras also had to work overtime in their own department so as not to let those lines of business fall behind. Thanks to these extraordinary efforts, Altana was able to satisfy all of its orders for ointment. It did not turn away any customers, its sales force did not lessen its efforts, and Altana was even able to maintain an inventory of ointment at all relevant times.

Abbott conceded that it was liable for all of Altana's direct costs in making the destroyed ointment, the cost of destruction and disposal, and the additional costs incurred in making the replacement product (that is, the overtime expenses), for a total payment of $488,283.13. What else, one might ask, is there to do? Altana has an answer: it believes that it is entitled not only to the amounts we have described, but also to "lost profits" of $540,159 and "overhead costs" of $207,142.91. The parties cross-moved for partial summary judgment on these two issues. The district court ruled against Altana and in favor of Abbott on both issues. It entered judgment for Altana in the unopposed amount of $488,283.13, and Altana has appealed from the rejection of its additional demands. We affirm.

## I

We review summary judgment decisions *de novo*. *Sound of Music Co. v. 3M*, 477 F.3d 910, 914 (7th Cir. 2007). Our jurisdiction in this case is based on diversity, and the parties agree that Illinois law governs this dispute.

## A

The crux of Altana's argument for seeking lost profits in addition to the damages already paid by Abbott is that it "would have made, sold and profited from the sale of, both the product Altana was required to destroy as a result of Abbott's breach, and the product made in the wake of the recall to replenish Altana's inventory." Altana does not specify, however, when and how it would have made this additional product, if the original product had not been defective. If it would have made the ointment a couple of months later during normal business hours, it necessarily would have been substituting the making of those quantities of ointment for whatever it was manufacturing at that future time—that is, ointment that it made, sold, and reaped profits from. No one disputes that Altana is in the business of making ointment, but if the relevant time window is of unlimited scope then of course any amount of ointment is an amount that "would have been made" eventually. In order to replace the recalled ointment, Altana put unusual strain on its facilities and expended unusual resources, outside the ordinary course of business, and the sum that Abbott agreed to pay has fully compensated it for doing so. The record does not show that Altana would have decided to double its

output, at a high cost in overtime, if Abbott had supplied usable erythromycin. This inference is reinforced by the fact that, having destroyed the defective half of the fruits of this double-manufacturing, Altana still met all demand for its product, even as its sales force continued the same selling efforts.

To affirm the district court's ruling on the issue of lost profits, we need only confirm that awarding lost profits is not necessary to put Altana in the position it would have occupied absent the breach.

If Abbott had supplied erythromycin that met all pertinent quality standards, Altana would have made 1.2 million tubes of ointment, incurred the ordinary costs of doing so, sold these tubes, and earned its ordinary profits. Because of the defective product, Altana incurred the following costs: (1) direct costs (materials, etc.) of making the destroyed product; (2) costs of destroying that product; (3) direct costs (materials, etc.) of making the replacement product; (4) extraordinary costs (overtime) of making replacement product.

Abbott reimbursed Altana for the first, second, and fourth cost categories. This leaves Altana bearing only the direct costs of making one batch of product, the replacement batch, and pocketing the ordinary profit from this batch. That is the same position it would have been in if Abbott had not breached the contract. To award anything more in damages would not be compensating Altana for "lost profits"; it would be giving Altana a windfall.

To avoid this result, Altana attempts to invoke the "lost volume seller" doctrine. See U.C.C. § 2-708(2); *Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 682 (7th Cir. 1987). This attempt is misplaced. The district court noted that the doctrine did not apply because Altana was not the seller in the contract between Abbott and Altana, which is the one at issue here. Altana responds that the doctrine ought to apply nonetheless, because Altana is not just a buyer but a "buyer-reseller."

As Abbott points out, the doctrine cannot be applied blindly in the case of a so-called buyer-reseller who is the nonbreaching party, because in such a case there is no automatic proof of a lost sale and therefore lost profit. When a volume seller enters into a contract with a buyer who then breaches by repudiating the goods, that is by definition a lost sale suffered by the nonbreaching party. The fact that the seller goes on to sell to other parties does not mitigate its damages because it is a volume seller and would have made those additional sales anyway.

When the nonbreaching party is a buyer, the breach of contract does not necessarily mean that there was a lost sale. Lost sales must be shown separately. In the buyer-reseller cases cited by Altana, the nonbreaching party sufficiently demonstrated loss of sales. See *Canusa Corp. v. A & R Lobosco*, 986 F. Supp. 723, 732 (E.D.N.Y. 1997) (applying New York law) (holding that "Canusa has provided substantial evidence in the form of testimony of a *rising market* in the *relevant period*" and "Lobosco does not contest that there was a viable market for" the product, so "the fact that Canusa sold all the [product] it acquired does not bar it from recovering damages for

the loss of the [product] it *could have sold* if it was obtainable") (emphasis added).

Although Altana contends that the ointment recall occurred during a rising market, this case is distinguishable from *Canusa* because Altana was not simply obtaining as much product for resale as possible; it was buying erythromycin with which to *manufacture* the product (ointment) for which demand was allegedly increasing. Altana admitted that it did not lose a single sale as a result of the recall and that it did not turn away a single willing customer. Because Altana has not shown that it would have resorted to overtime manufacturing during the relevant period if all of the erythromycin it received had been satisfactory, it has not shown any evidence of sales that it would have been in a position to consummate had the breach not occurred. Therefore, nothing in the "lost volume seller" doctrine supports any additional recovery for Altana.

**B**

Altana also claims that the district court should have permitted it to recover a certain portion of its overhead costs. It argues that it could not sell the destroyed batch, and therefore could not use those revenues to help cover its overhead costs. The district court correctly pointed out that such a claim requires Altana to show at least one of two things: (1) that Altana's overhead costs increased as a result of the breach, or (2) that Altana suffered actual lost profits from lost sales because of the breach, implying that the breach caused Altana to have less revenue

with which to cover its overhead costs than it otherwise would have had. As we have already pointed out, Altana has not shown that it lost any revenues, and so it had the same amount of revenue over which to spread its overhead costs as it would have had if the defective erythromycin had never been delivered. As for the first condition, Altana has submitted no evidence that its overhead costs increased. The costs that did increase as a result of the breach, such as wages, have already been covered by the amount that Abbott has paid to Altana.

\* \* \*

We AFFIRM the judgment of the district court.