USCA1 Opinion

 

 March 29, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1978 ATLANTIC TRACK & TURNOUT COMPANY, Plaintiff, Appellant, v. PERINI CORPORATION, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ _____________________ David J. Hopwood, with whom Heafitz & Hopwood, was on brief _________________ _________________ for appellant. Charles E. Schaub, Jr., with whom Christopher J. Petrini, _______________________ _______________________ and Hinckley, Allen & Snyder, were on brief for appellee. ________________________ ____________________ March 29, 1993 ____________________ TORRUELLA, Circuit Judge. Appellant Atlantic Track & ______________ Turnout Company ("Atlantic") brought this breach of contract action pursuant to the Uniform Commercial Code ("Code"), Mass. Gen. L. ch. 106, 2-101, et seq. (1992). Atlantic alleged that _______ appellee Perini Corporation ("Perini") failed to perform under a contract for the purchase and sale of railroad materials. The court deferred decision on cross motions for summary judgment and ordered a trial limited to two issues: (1) whether the contract was ambiguous; and (2) whether trade usage would supplement the contract terms to enable Atlantic to maintain its action. After Atlantic's proffer, the court entered a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c)1 in favor of Perini. We affirm that judgment. BACKGROUND BACKGROUND __________ On October 21, 1987, the Massachusetts Bay Transportation Authority ("MBTA") awarded Perini the Eastern Route Track Rehabilitation Project. The project required Perini to rehabilitate a thirteen mile section of double track. The rehabilitation included undercutting the track to replace the ballast, the track's stone foundation, and disposing of any ____________________ 1 Rule 52(c) provides in relevant part: If during a trial without a jury a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim . . . that cannot under controlling law be maintained or defeated without a favorable finding on that issue . . . . -2- contaminated ballast materials. In the spring of 1988, a sub-contractor tested the ballast under the track and determined that it was all contaminated. Perini received the test results on June 21, 1988 and discussed them with the MBTA on July 17, 1988. In early June, 1988, Perini solicited an offer from Atlantic to buy certain salvage from the project. Between June 28 and 30, 1988, Atlantic issued five purchase orders for "all available" materials. The orders also furnished an estimate of the amount of salvage that would become available. On August 18, 1988, the MBTA directed Perini to suspend undercutting operations until further notice. On September 13, 1988, the MBTA permanently halted all undercutting due to fiscal constraints. As the elimination of the undercutting reduced the value of the contract by 52%, Perini stopped all work. By October 26, Perini had no physical presence on the project site. On October 31, 1988, Perini proposed an equitable adjustment of the MBTA contract. The proposal entailed an increase in payment for completion of the remaining work under the contract. The MBTA rejected Perini's proposal. Perini and the MBTA thus agreed to terminate the contract. Atlantic knew by August 22, 1988 that all undercutting was suspended and later asked Perini when the remainder of the materials would be available. Perini replied that the MBTA might terminate the project and that Perini had already shipped "all -3- available" salvage in accordance with the purchase orders.2 Atlantic sued Perini, claiming that the amount of materials shipped was well below the stated estimates. LEGAL ANALYSIS LEGAL ANALYSIS ______________ Two reasonable interpretations of the contract's plain language exist. On one hand, "all available" implies that Perini satisfied its obligation under the contract by supplying the salvage material that became available; if no material became available to Perini, Perini faced no liability under the contract.3 On the other hand, the estimates offered in the purchase orders suggest that Perini had to deliver a quantity nearing those estimates. To convince the court that the latter interpretation represented the true agreement, Atlantic had to overcome two hurdles. First, as the plaintiff, Atlantic had the burden of proving its interpretation by a preponderance of the evidence. Second, any ambiguity in the contract should normally be interpreted against Atlantic, the drafter of the purchase orders. LFC Lessors, Inc. v. Pacific Sewer Maintenance, 739 F.2d 4, 7 _________________ __________________________ (1st Cir. 1984). Atlantic offered two theories beyond the plain language of the contract supporting its interpretation of the terms. Specifically, Atlantic argued that: (1) trade usage of the term ____________________ 2 At this point, Perini had delivered approximately 15% of the materials estimated. 3 Of course, the Code requires that Perini attempt to attain the materials in good faith. Mass. Gen. L. ch. 106, 2-306. -4- "all available" required Perini to deliver close to the estimated quantity of materials, and (2) 2-306 of the Code expressly required Perini to provide a quantity approximating its stated estimate. In addition, Atlantic argued that Perini acted in bad faith. Atlantic revives these theories in this appeal, and we address them in turn. I. Trade Usage I. Trade Usage The district court ruled that Atlantic's trade usage proffer failed to prove by a preponderance of the evidence that the contract terms embodied Atlantic's proposed meaning. As this conclusion constitutes a factual finding, Mass. Gen. L. ch. 106, 1-205(2), we review it only for clear error, Athas v. United _____ ______ States, 904 F.2d 79, 80 (1st Cir. 1990). ______ Trade usage will supplement the terms of a contract only when the parties know or should know of that usage. Mass. Gen. L. ch. 106, 1-205(3). In the present case, Atlantic provided no evidence that Perini knew or should have known of Atlantic's interpretation of the term "all available." There was no evidence that Perini engaged in the same trade as Atlantic. Indeed, one Atlantic witness testified that Perini was not a competitor of Atlantic's. Transcript, Non-Jury Trial Proceedings - Day 1, at 106. Therefore, we cannot assume knowledge of Atlantic's trade practices. Furthermore, another Atlantic witness testified that he discussed the terms of the contract with a Perini representative, but never explained the alleged trade usage of "all available." Id. at 70. Given the lack of __ -5- evidence, we cannot find that the district court clearly erred in finding that the proposed trade usage of the term did not supplement the contract terms. II. Section 2-306 II. Section 2-306 Both parties agree that the disputed contract constitutes an output contract governed by 2-306 of the Code. Section 2-306 of the Code provides in relevant part: (1) A term which measures the quantity by the output of the seller . . . means such actual output . . . as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate . . . may be tendered or demanded. In the present case, the contract provided an estimate of the expected output, and Perini tendered only 15% of that quantity. Thus, Atlantic argues that according to 2-306, Perini violated the contract. While many courts and commentators have discussed the meaning of the "unreasonably disproportionate" clause of 2-306 as applied to requirements contracts, little, if anything, has been written on the clause's application to output contracts. We review the former analysis, however, because it provides valuable instruction due to the similarity between these two types of contracts. With respect to requirements contracts, courts differ on the meaning of the "unreasonably disproportionate" clause. Some courts find that "even where one party acts with complete good faith, the section limits the other party's risk in -6- accordance with the reasonable expectations of the parties." Orange Rockland v. Amerada Hess, 397 N.Y.S.2d 814, 819 (1977). _______________ ____________ Most courts and commentators, however, treat cases in which the buyer demands more than the stated estimate differently than cases in which the buyer demands less. See, e.g., Empire Gas ___ ____ __________ Corp. v. American Bakeries Co., 840 F.2d 1333, 1337-38 (7th Cir. _____ _____________________ 1988); Angelica Uniform Group, Inc. v. Ponderosa Systems, Inc., _____________________________ _______________________ 636 F.2d 232, 232 (8th Cir. 1980) (per curiam); R.A. Weaver and _______________ Associates, Inc. v. Asphalt Construction, Inc., 587 F.2d 1315, ________________ ___________________________ 1322 (D.C. Cir. 1978). The courts that employ separate analyses hold that while 2-306 precludes buyers from demanding a quantity of goods that is unreasonably disproportionate to a stated estimate, it permits "good faith reductions that are __________ highly disproportionate." R.A. Weaver and Associates, Inc., 587 _________________________________ F.2d at 1315 (emphasis added).4 The Seventh Circuit explained the argument well, Empire ______ Gas Corp., 840 F.2d at 1338-40, and we adopt its reasoning. __________ Essentially, the argument is the following. The "unreasonably disproportionate" clause is somewhat redundant in light of the good faith requirement in that section. The clause therefore was ____________________ 4 The comments to the Code shed little light on the issue as they, too, are ambiguous. Empire Gas Corp. v. American Bakeries ________________ _________________ Co., 840 F.2d at 1338. Comment 3 to 2-306, for example, ___ provides that an "agreed estimate is to be regarded as a center around which the parties intend the variation to occur," suggesting that the two situations should be treated similarly. Comment 2 to 2-306, on the other hand supports the view that the two situations should receive different treatment as it provides that "good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance." -7- likely provided to explain the good faith term. The good faith requirement with respect to disproportionately increased demands needed explanation as certain forms of exploitation in that situation do not clearly constitute bad faith. For example, if the market price of the subject goods rises above the contract price, a buyer in a requirements contract might be tempted to demand more goods than it truly needs in order to resell them for the better market price. The clause eliminates that opportunity. On the other hand, exploitation, beyond bad faith, is not a concern if a buyer demands less than a stated estimate. The seller has the opportunity to sell any excess of the subject goods on the market. Moreover, an obligation to buy approximately a stated estimate of goods would pose a significant burden on buyers as it would force them to make inefficient business judgments, when the point of entering a requirements contract was to engage suppliers without binding themselves to buy more goods than they need. Essentially, a requirements contract represents a risk allocation. "The seller assumes the risk of a change in the buyer's business that makes continuation . . . costly, but the buyer assumes the risk of a less urgent change in [] circumstances." Id. at 1340. __ The same rationale supports different treatment of cases such as the present one, in which the seller in an output contract tenders less than a stated estimate, from cases in which the seller tenders more. If a seller saw an opportunity to -8- increase his profits by buying additional goods to resell as output to the buyer, this exploitation might not conclusively establish bad faith. The proviso would forbid such conduct. See ___ id. at 1338. On the other hand, an obligation to sell __ approximately the stated estimate may force the seller to make inefficient business decisions that the seller did not likely intend when he bargained to keep the contract's quantity provision open. Like the risk allocation in the requirements contract, the output contract allocates to the buyer the risk of a change in the seller's business that makes continuation costly, while the seller assumes the risk of a less urgent change in circumstances. Indeed, pre-Code Massachusetts courts held that output contracts necessarily contemplated that the level of production would be governed by business judgment. See ___ Neofotistos v. Harvard Brewing Co., 171 N.E.2d 865, 868 (Mass. ___________ ____________________ 1961). We see no reason for a change in that rationale. Adopting this interpretation of 2-306, our next, and only inquiry under this section, is whether Perini acted in good faith. III. Good faith III. Good faith The district court determined that Perini acted in good faith. This was a factual determination that we review only for clear error. Athas, 904 F.2d at 80. _____ Atlantic offers two indications of bad faith by Perini. First, Atlantic argues that Perini acted in bad faith by failing -9- to notify Atlantic of the June 21 test results. However, Atlantic offered no evidence that the additional contaminated ballast signified to Perini that the contract would end. Indeed, the record indicates that the additional contamination was good news to Perini because the more contamination that existed, the more money Perini stood to earn under the contract. The MBTA did not notify Perini of its desire to end the contract until August 18 when it suspended the undercutting; Atlantic learned of the suspension just four days later. Thus, the court did not clearly err in finding that Perini acted in good faith with respect to notification. Second, Atlantic argues that Perini acted in bad faith by failing to make a reasonable attempt to complete the MBTA project when the MBTA eliminated the undercutting. Atlantic contends that in its negotiations for an equitable adjustment of the contract, Perini requested an unreasonable increase in the contract price. Thus, Atlantic argues that Perini's attempt to complete the project was in bad faith. Based on the evidence presented, however, this argument fails. For one thing, a contractor may seek an equitable adjustment to the contract when a large quantity of work is eliminated. See Peter Kiewit Sons' Co. v. United States, 109 Ct. ___ ______________________ _____________ Cl. 517, 522-23 (1947). Atlantic failed to show that Perini did not make reasonable attempts to negotiate an adjustment. That the MBTA and Perini failed to reach an acceptable agreement does not show that the attempted negotiations were in bad faith. -10- Moreover, a party who ceases performance under an output contract for independent business reasons acts in good faith. Neofotistos, 171 N.E.2d at 868. Atlantic offered no ___________ evidence that Perini did not agree to end the MBTA contract due to a valid independent business reason. Indeed, Atlantic offered no evidence of any reason why Perini agreed to end the contract. Thus, the district court did not clearly err in its good faith determination. CONCLUSION CONCLUSION __________ Based on the evidence presented, the district court properly granted summary judgment in favor of Perini. Affirmed. ________ -11-