Whitehead, J.
Introduction
The parties to this suit are signatories to a ten-year output contract to haul and dispose of wastewater sludge. The plaintiff, Waste Stream Environmental, Inc. (“Waste Stream”), filed suit against the defendant, Lynn Water and Sewer Commission (“Commission”), for a declaratory judgment interpreting the contract and for monetary relief on a variety of claims grounded in its view of the contract terms. Waste Stream has *724 moved for partial summary judgment on the claim for a declaratory judgment, as well as the claims of breach for contract, quantum meruit, and unjust enrichment. For the following reasons, the motion is allowed in part and denied in part.
BACKGROUND
The Lynn Water and Sewer Commission (“Commission”) is a quasi-public authority created in 1982[1] to manage the wastewater from Lynn, Swampscott, Saugus and Nahant. The Lynn treatment facility receives raw sludge which is pre-screened for sizeable objects (old tires, etc.). The raw material is then processed, and chemicals and water are added. The facility produces three types of sludge: primary, secondary and “cake.” Primary sludge is thicker and heavier, and is preferred for use in dewatering due to its higher solids content. Secondary sludge has a lower content of solids, and is thinner and lighter. “Cake,” or mud-like material, results from dewatering, whereby a filtering process squeezes the sludge through an accordion-type press in order to partially separate the solids from the liquid. Cake can be incinerated; cake with lower water content optimizes the operation of incinerators. All types of sludge are hauled off-site for disposal.
Pursuant to G.L.c. 30B, §5, the Commission issued a “Legal Notice” or announcement of an upcoming bid in the summer of 1996.[2] The corresponding bid solicitation package[3] was made available in August of that year. The package called for the removal and disposal of sludge and other non-hazardous waste from the treatment facility. The bid solicitation package consisted of several documents, including a ten-page document entitled “Information to Bidders” (“ITB”), a six-page document entitled “Specifications” (“Specifications”), and a copy of the three-page contract (the “Contract”) to be signed by the successful bidder.
The ITB contains primarily general bid preparation information concerning how and when to bid, what items must be part of the bid submission, what opportunities exist to visit the facility and to seek further information, and how the winner will be selected. The ITB further indicates when the Specifications may be picked up. It also states that “all information listed in the Information to Bidders and Specifications will be used as criteria to determine the most responsible and responsive bidder,” and that “responsive bidders must supply all of the information requested.” Some technical sludge information is contained in the ITB. Much of it also is repeated in the Specifications.
The ITB additionally includes several on-going business operations items that appear exclusively in the ITB. Those items include annual contract price increases, performance bonding requirements and their annual adjustments, required levels of insurance, and a jurisdictional selection and jury-waiver clause. The ITB is also the only source of the qualifier:
The LWSC makes no guarantees of sludge quantities (minimums or máximums), and Sludge Characteristics or quality any time during the life of this contract.
The Specifications provide extensive technical details, some of which are repeated in the ITB. They include a site description, estimated sludge volumes and solid-to-liquid percentages, day-to-day on-site operational requirements, loading procedures, transportation routes, ultimate disposal site requirements, permitting, and measurement and payment procedures. The Specifications state that all sludge over the estimated daily volume will be incinerated on site. In addition, the Commission issued two addenda during the bidding process, which became part of the bid solicitation package.[4] The addenda stated that they “shall be taken into consideration and be included in the bidder’s bid.”
The three-page Contact was given to bidders at the beginning of the process; they were required to submit a signed copy with their bid. The contract document, in its First and Second clause, incorporates by reference the “SPECIFICATIONS” and the “BID.”[5] The parties agree that there is no list that identifies exactly what documents constitute the SPECIFICATIONS, while the ITB lists all of the items required for the BID.
The actual Bid Sheet provides a space to record pricing, and lists three award criteria. First, the contract goes to the bidder “meeting all the specifications and conditions within this bid document.” Second, only one bidder will be accepted, who will provide disposal for all plant residuals. Finally, the winning bidder will have the lowest price based on the yearly estimates given. However, the sheet also states that the estimates are for comparison with competing bids and may not represent the actual quantities to be handled during the ten years.
The bid solicitation package indicates that, at the time that the package was prepared, cakes contained an average of 23% solids, with a range of 17 to 47%, and primary and secondary sludge averaged 4.5%[6] solids, with a range of 2 to 6%. The package also provides sludge volume estimates, anticipated to be 9,000 to 18,000 gallons per day.[7] Both the ITB and Specifications indicate that any materials over the estimates will be incinerated on site.[8] However, harkening back to its previous contract for hauling, the Commission reserve the right to 1) substitute primary sludge at any time, and 2) increase sludge volume by up to 25% in order to perform maintenance, either planned or unplanned.
In the waste disposal industry, the percentage of solids remaining in the liquid is a factor to be considered for disposal. Sludge disposal facilities in New England are limited, with some restricting the type and pricing of sludge accepted, according to the percentage of solids it contains. In addition, those facilities most often accept sludge by weight, not volume.[9] *725 The contract at bar required pricing by volume, not weight, which is atypical in the industry.[10]
Waste Stream Environmental, Inc. (“Waste Stream”) is a New York corporation qualified to do business in Massachusetts. Waste Stream submitted a complete bid package and was selected[11] as the “most responsible and responsive bidder” per G.L.c. 30B, §6. The parties entered into a contract in January 1997. Waste Stream’s bid cover letter acknowledges handling of the bid security, bid bond, and Addendum No. 1. It also states Waste Stream’s intent that the bid respond to all aspects of the specifications.[12]
The parties contracted for the removal of all plant residuals, be they cake or liquid sludge, or both. The ten-year agreement called for the removal of cake at $74.46 per ton, and removal of liquids at $0.079 per gallon. However, the Commission anticipated the bulk of the contract work to be for the removal of secondary sludge, as described earlier, not cake or primary sludge. At the time of the contract, the Commission was operating two incinerators which burned cake on-site, thereby reducing to the anticipated 9,000 to 18.000 gallon-per-day level the daily volume of sludge which was to be hauled.[13] There was no change in the volume of raw sludge received from the towns during the time of this controversy, and none was anticipated.
In early 1998, Waste Stream began pursuing the Commission to re-negotiate the contract because of increased levels of solids in the secondary sludge. Then, in the summer of 1998, approximately eighteen months after the contract was entered into, one of the two incinerators in Lynn exploded, making it inoperable. Shortly thereafter, the Commission made a decision to shut down the second incinerator for safety reasons,[14] and to send all of its sludge off-site for disposal. All on-site dewatering and burning ceased.[15] All sludge, both primary and secondary, was then passed directly to Waste Stream for disposal. The record indicates that the volumes began escalating in August 1998, ultimately reaching a range of80,000 to 97.000 gallons per day. The solids content continued to vary, averaging 5 to 6% in 1997 to 2000.[16]
The parties disagreed on what solids content and volume requirements are set by the contract. In addition, concerns were raised regarding timely bill payment, actual vs. billed sludge volumes, and the proper value of the annual bond.[17] At one point, Waste Stream expressed an intent to cease hauling due to these problems, but later changed its position when the Commission noted the likelihood of very significant DEP permit violation fines being levied if Waste Stream ceased removal. Waste Stream has continued to perform under the contract, but under protest. The parties signed an “agreement to negotiate” on April 9, 1999, but no resolution was ever reached.[18] During this same time period, the Commission filed for and collected insurance monies covering the incinerator damages and the continued cost of sludge removal. It also conducted a feasibility study on how best to manage sludge disposal in the future.[19]
Waste Stream ultimately chose to file suit in March 2000. Due to changes implemented at the Lynn facility, the daily volume and solids content has dropped to levels below the range stated in the contract. The dispute in this case thus focuses on the mid-term elevated sludge volume and solids content levels.
DISCUSSION
1. Standard of Review
“Summary judgment is a device to make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved.” Cassesso v. Comm’n of Corr., 390 Mass. 419, 422 (1983) (citations omitted). A party seeking to recover upon a claim or to obtain a declaratory judgment may move for summary judgment in its favor upon all or any part thereof. Mass.R.Civ.P. 56(c). Courts grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law Id.; Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The facts are viewed in the light most favorable to the non-moving party. O’Sullivan v. Shaw, 431 Mass. 201, 202 (2000). Summary judgment is to be granted only if “the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Rule 56(e) requires the court to consider only those facts that would be admissible as evidence, based on personal knowledge. Madsen v. Erwin, 395 Mass. 715, 719 (1985) (distinguished on other grounds). “Hearsay in an affidavit is unacceptable to defeat summary judgment.” Id. at 721. “Conclusory statements, general denials, and factual allegations not based on personal knowledge are insufficient to avoid summary judgment” Id. Polaroid Corp. v. Rollins Envtl. Services, 416 Mass. 684, 696 (1993).
The central dispute in this case involves the parties’ different interpretations of the contract into which they entered. Those differing interpretations raise questions of law for the court, not genuine and material issues of fact for a jury.[20]
2. Contract Interpretation and Construction
As noted, “Construing the language of a[] contract is a question of law for the reviewing court.” Affiliated FM Ins. Co. v. Const. Reins. Corp., 416 Mass. 839, 842 (1994). When interpreting a contract, the court must give full effect to all terms, to be “taken in their plain and ordinary sense . . .” Rogaris v. Albert, 431 Mass. 833, 835 (2000). “When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or *726 changing its terms.” Affiliated FM, 416 Mass. at 842 (quoting Keating v. Stadium Mgmt. Corp., 24 Mass.App.Ct. 246, 249 (1987)). Language must be construed to “give reasonable meaning whenever possible” to the parties’ intentions. Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981). All words should be given effect if possible; none should be considered superfluous “if any other construction is rationally possible.” Computer Sys. of Am., Inc. v. W. Reserve Life Assurance Co. of Ohio, 19 Mass.App.Ct. 430, 437 (1985). While doubtful language is to be construed against the drafter, the intention of the parties is of higher priority. Affiliated FM, 416 Mass. at 881. After contract, “[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.” Restatement (Second) of Contracts §202(4), at 86 (1981).
A. Contract Documents
The first legal question here is whether or not the Contract includes the Information to Bidders document. Waste Stream maintains that the ITB is not part of the Contract because it is not explicitly incorporated by reference. It essentially argues that the contract term SPECIFICATION refers only to the six-page Specification document; thus, the ITB is excluded from the contract and not binding on the parties. In contrast, the Commission maintains that all of the bidding documents are incorporated generally through the BID. Further, the Commission argues that because both parties relied on several specific elements of the ITB during the past six years, Waste Stream is prohibited from now denying incorporation of the ITB.
Contract bidding situations represent a variation on contract formation. Simply put, invitations to bid are “by necessary implication” fully incorporated into any bid submission. Daddario v. Town of Milford, 296 Mass. 92, 95 (1936). In a bidding situation, the invitation to bid is an offer to the bidder to submit a bid. Response to the bid is an acceptance of that offer, creating at least an implied contract whereby the bidder agrees to comply with all of the offeror’s terms and conditions, and the offeror in turn agrees to “fairly and honestly consider” the bid. Firth Constr. Co., Inc. v. U.S., 36 Fed.Cl. 268, 271 (1996) (examining bid responsiveness to an invitation due to missing terms and possible incorporation by reference).[21] The “bid package [ ] obligate(s) the bidder to perform in accordance with the material terms of the [invitation].” Id. at 273-74 (based on the consistent position of the federal General Accounting Office and the Restatement (Second) of Contracts §59).
The bid also becomes an offer to contract, and must be sufficient to form a “valid and binding contract” upon acceptance. Firth, 36 Fed.Cl. at 274. As such, bid responsiveness to the invitation is necessary to ensure fairness to the other bidders, so that everyone can be assured that all submissions will be judged equally relative to their commitment to the same set of “specifications and conditions in the invitation.” Id. at 274 (espousing the position of the Federal Court of Claims).[22] The final acceptance of the bid is necessarily undertaken on the same terms as the bid submission, since acceptance of materially varied terms would actually be a rejection (under common law). Moss v. Old Colony Trust Co., 246 Mass. 139, 148 (1923).
The ITB in this case is an invitation to bid, one part of the bid solicitation package. As per Firth, the entire solicitation package was an offer from the Commission to bid. In response to that offer, Waste Stream formulated a bid proposal. Submission of that bid was an acceptance of the offer to bid, which created an implied contract that the Commission would fairly consider the bid. At the same time, the submission of the bid proposal also created an offer from Waste Stream to contract for the waste disposal job. The Commission’s acceptance of the offer came with the selection of Waste Stream as the lowest “most responsible and responsive bidder,” and ultimately the signing of the final contract.
The parties agree that Waste Stream’s bid was “responsible and responsive.” To be responsive, the bid had to encompass and comply with all of the requirements of both the ITB and the Specifications. Waste Stream’s bid cover letter further demonstrates an intent to be responsive; it states that Waste Stream intended to respond to all terms, and if it did not, its failure to do so was to be deemed only an oversight. On submission, the bid therefore is deemed to have included the ITB terms, and became an offer to do the job based on those terms. The Commission’s acceptance of the bid created a valid and binding contract, a contract which included the ITB terms.[23] Stated succinctly, the ITB is subsumed within the bid; the bid is operationally incorporated into the Contract.[24]
Though the Court need not look further, the parties’ conduct or course of performance also reflects the inclusion of the ITB into the Contract. In particular, Waste Stream accepted annual pricing increases, provided adjusted bonds annually (albeit protesting the increased size), maintained the proper levels of insurance, and relied on the jury-waiver clause within the context of this case. All four of those elements are referenced only in the ITB. Of the four elements, the jury waiver-actions are the most notable. Waste Stream, the party arguing here for the limited contract definition excluding the ITB, came to this Court in July 2000 and successfully sought a denial of the Commission’s jury trial request, relying directly on the terms of the ITB.[25] Waste Stream’s position in 2000 was the antithesis of its position today.[26] If the contracting process left any doubt regarding the binding *727 nature of the ITB, the parties’ performance certainly-erased any possible question.
B. Output Contracts
When the court construes contract language, it does so as a question of law, particularly when considering the legal operation of the agreement rather than its language. Seaco Ins. Co. v. Barbosa, 435 Mass 772, 779 (2002); Restatement (Second) of Contracts §200, Reporter’s Notes at 82. The contract at bar is one for sludge disposal services, and thus falls under the common law, as opposed to the Uniform Commercial Code (UCC). Mattoon v. City of Pittsfield, 56 Mass.App.Ct. 124, 141 (2002) (determining that municipal water delivery and sale is a service, not a sale of goods).[27] However, few Massachusetts output/requirements contracts cases are known to this Court, particularly ones decided under the common law.[28] For reasons which will be discussed in more detail later, the ones which are known are not helpful where an overage in output is alleged. In some situations, it is appropriate to analogize to the UCC, when deciding a common-law case.[29] Magliozzi v. P&T Container Ser. Co., Inc., 34 Mass.App.Ct. 591, 593 (1993); Dazien’s Inc. v. Hodgman Rubber, 7 Mass.App.Ct. 901, 901 (1979); Burlington Motor Carriers, Inc. v. APL Ltd., No. CIV. A. 99-157 MMS, 1999 WL 1427683, at *6 (D.Del. 1999) (applying UCC to a breach of a common-law output contract for freight transportation services). The Court analogizes to the UCC in this case.
Procurement contracts have either definite, indefinite or output/requirements-based quantity terms. Coyle’s Pest Control Inc., H.U.D.B.C.A. No. 96-A-121-C10, 1997 WL 8496, at *6 (Jan. 6, 1997) (quoting Mason v. U.S., 615 F.2d 1343 (Ct.Cl. 1980)).[30] Output or requirements contracts are those with fixed unit-pricing but no definitive quantity terms. Neofotistos v. Harvard Brewing Co., 341 Mass. 684, 686 (1961); Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283, 287-88 (1902). The quantity term is set by the indefinite output or requirements of one party, such as all the bread one facility can produce or all the gas needed for a year. The controlling quantity terms are thus measured by the output of the producing party (“producer”) or the requirements of the consuming party (“consumer”). Neofotistos, 341 Mass. at 686. Such contracts need not be titled or described as output or requirements contracts in order to be considered as such under the law. See generally Brodsky v. Morrill Co., 237 Mass. 86 (1921); Associated Credit Services, Inc. v. City of Worcester, 33 Mass.App.Ct. 92, 93 (1992).
Contracts lacking a quantity term are valid under both the common law and the UCC because the party setting the volume agrees to deal exclusively with the other contracting party. Neofotistos, 341 Mass. at 686; see generally Brodsky, 237 Mass. at 86, and Burgess, 180 Mass. at 283. This exclusivity establishes mutual consideration, which would normally be lacking if one party were free to contract with no obligation. Burgess, 180 Mass. at 284. In addition, the volume setter agrees to establish quantities in good faith, and to employ standards of fair dealing such that the quantities will be reasonably foreseeable, as per G.L.c. 106, §2-306.[31] Mishara Constr. Co., Inc. v. Transit-Mixed Concrete Corp., 365 Mass. 122, 124-25 (1974).
In determining reasonable quantity or volume limits, UCC Comment 3 states:
If an estimate of output or requirement is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement show a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.
G.L.c. 106, §2-306 at 176. “Reasonable foreseeability” and the obligation of “good faith” are “somewhat redundant,” in that one defines the other. Atlantic Track & Turnout Co. v. Perini Corp., 989 F.2d 541, 544 (1st Cir. 1993) (relying on Empire Gas Corp. v. Am Bakeries Co., 840 F.2d 1333 (7th Cir. 1988) (distinguished on other grounds)). The non-controlling party must be able to “reasonably assume” that the output-controlling party will operate its business in “good faith and do nothing to interfere with normal production.” Neofotistos, 341 Mass. at 689. When quantities vary greatly from those reasonably foreseeable, they become unreasonably disproportionate, and thus represent bad faith. Atlantic Track, 989 F.2d at 544; see infra, n.38 (discussing bad faith).
Contract estimates play a critical role in allocating risk in output contracts. The risk of reasonable change in the output is assigned to the consumer, while the producer carries the risk of being restrained to “less urgent change[s] in circumstances.” Atlantic Track, 989 F.2d at 545. Contract risk allocation is now common in “hard-to-determine” situations such as construction projects. A&A Mechanical, Inc. v. Thermal Equip. Sales, Inc., 998 S.W.2d 505, 13 (1999). Allowing for mid-term contract adjustments “in light of the actual conditions encountered obviates both expensively detailed pre-contract estimates and high, ‘worst case’ bids.” Id. The producer appropriately bears the cost of additional labor, while yet benefiting from potential future consumer efficiencies. Id.
Contract estimates are used when bidders need guidance and specific information is not available. Womack v. U.S., 389 F.2d 793, 801 (1968). Estimates must be based on the most relevant and reliable information available. Id. Bidders must be able to rely on the estimates, or else their “inclusion in the invitation would be surplusage at best or deception at worst.” Id. Government contract bidders in particular may rely on estimates as “honest and informed conclusions,” since the “government is not free to carelessly guess at its needs.” Crown Laundry and Dry *728 Cleaners v. U.S., 29 Fed.Cl. 506, 519-20 (1993).[32] Ultimately, estimates enable the successful bidder to “begin making preparation to satisfy the contract.” Empire Gas, 840 F.2d at 1340.
Good faith changes in actual output cannot be based on mere “second thoughts about the terms of the contract.” Id. Producers may not “arbitrarily and unilaterally change certain conditions prevailing at the time of the contract so as to take advantage of market conditions at the [consumer’s] expense.” Orange and Rockland Util., Inc. v. Amerada Hess Corp., 397 N.Y.S.2d 814, 818 (Appellate Division, 1977). In situations where estimates of waste are supplemented by qualifications of no mínimums, it cannot be assumed that one “is not required to deliver any waste.” Empire Sanitary Landfill, Inc. v. Comm. of Penn. Dept. of Envtl. Resources, 546 Pa. 315, 339 (1996). Ergo, one also cannot assume that a qualifier of no máximums equates to a mandate to dispose of an endless volume of waste. At the same time, one cannot assume that contracts terminate as soon as quantities vary unreasonably. Philadelphia Corp. v. Niagara Mohawk Power Corp., 621 N.Y.S.2d 237, 239 (1995).
Courts often treat unreasonably disproportionate increases in output differently from decreases. Empire Gas, 840 F.2d at 1337. When considering increases, courts routinely look to the unreasonable disproportion clause in the UCC, discussed above. G.L.c. 106, §2-306. “A sudden expansion of the plant by which requirements are to be measured would not be included within the scope of the contract as made but normal expansion undertaken in good faith would be within the scope of [2-306].” G.L.c. 106, §2-306, UCC Comment 2, at 175-76 (emphasis added). Even with this illustration, the term “unreasonably disproportionate” has feigned clear or precise definition. Orange, 397 N.Y.S.2d at 819. Only one court has articulated a list of factors[33] to consider, focusing on the unreasonableness “in view of the expectations of the parties.” Id.
Most courts focus heavily on the specific quantity estimate (usually a specific number) contained in the contract, comparing it to the actual resulting overage.[34] These numbers harken to the UCC position of the estimate as a center around which a certain reasonable percentage of variation may occur. G.L.c 106, §2-306 Comment3. Relevant cases include: State of Wash., Dept. of Fisheries v. J-Z Sales Corp., 25 Wash.App. 671, 678 (1980) (citing other case law and finding the following amounts to be unreasonably disproportionate: 20% over stated estimate, “double the estimate,” “three times the estimated amount of salmon eggs,” and 66% over the estimates for salmon carcasses); A&A Mechanical, 998 S.W.2d at 512 (finding a 29% overage to be unreasonable, and citing cases that found 15% and 20% overages to also be unreasonable). When presented with a range of performance, the outer limits of the range become the unreasonableness boundaries. McLouth Steel Corp. v. Jewell Coal and Coke Co., 570 F.2d 594, 605 (1978) (starting from the contract language with a range of 9,000 to 20,000/22,000 tons per month).
Decreased output situations receive different treatment under the law. Empire Gas, 840 F.2d at 1337-42 (providing a detailed discussion of the various legal treatments of output decrease situations); Canusa Corp. v. A&R Lobosco, Inc., 986 F.Sup. 723, 728-30 (E.D.N.Y. 1997). Courts treat decreases differently based both on early common-law premises[35] and an apparent conflict within the UCC.[36] Empire Gas, 840 F.2d at 1337-38. Courts also appear to be more concerned with exploitation in increased demands situations, particularly in a rising market,[37] than with volume decreases. Id. at 1338. Ultimately, courts make their decision on the good faith of the volume-setting party when volumes are reduced from estimates, usually even allowing for business discontinuance if done in good faith.[38] Atlantic Track, 989 F.2d at 544; Royal Paper Box Co. v. E.R. Apt Shoe Co., 290 Mass. 207, 210 (1935).
All six Massachusetts output cases cited earlier considered volume decrease situations, and held, either expressly or by implication, that decreases are valid if they are grounded on good faith. See supra n.29. In concert with Massachusetts case law and the First Circuit in Atlantic Track, this Court concludes that “the unreasonably disproportionate language of §2-306 does not apply to an output contract where the seller[/producer] tenders less than the estimate, and that the sole test in this context is good faith.” Canusa, 986 F.Sup. at 729 (citing Atlantic Track).
Turning to the case at bar, the agreement signed by Waste Stream and the Commission is a valid ten-year output contract for sludge disposal services, evidenced by the contract language and the performance of the parties. Though the parties never refer to it as one for output, the contract includes the defining elements: a fixed unit price of $0.79 per gallon for sludge; an indefinite quantity of 9,000-18,000 gallons per day; an indefinite quality of 2-6% solids content; and, an agreement that the Commission would deal exclusively with Waste Stream for all of its sludge disposal needs, as evidenced most expressly on the Bid Sheet.[39] The parties established mutual consideration when the Commission agreed to only deal with Waste Stream, and Waste Stream agreed to service all of the Commission’s needs.
By entering into such a contract, the parties allocated risks between them for ten years. Sludge disposal is not a business that can be run on exact numbers; a traditional definite quantity contract would not work in this situation. Waste Stream assumed the risk of reasonable variation around the estimates. It agreed to bear whatever fluctuations in costs accompanied such variations. Conversely, in setting the estimates, the Commission agreed to en *729 deavor to maintain its output volumes in the vicinity of its estimates. It agreed to bear the costs of any variance outside of the estimates.
The Commission also implicitly committed to set its production levels in good faith. The summary judgment record indisputably indicates that the volume and content ranges presented in the bid solicitation package were set based on reasonable business planning and judgment. The Commission sought to optimize the efficiency of its operation. It determined that its prior method of contracting was not efficient, that burning cake from primary sludge would optimize the worth of the incinerators, and that contracting to haul away secondary sludge would complement the burning and further an effective business plan. Accordingly, the Commission used care in setting the volume estimate at 9,000-18,000 gallons or 1-2 trucks per day, along with a sludge solids content in the 2-6% range.
During the contracting process, Waste Stream clearly intended, as evidenced in writing, to dispose of all refuse, and comply with all of the Commission’s specifications. It appropriately assumed reliance on the estimates, which were put forth in a clear and consistent manner throughout the process. As described in the case law, if Waste Stream were not meant to rely on the estimates, the numbers would be “surplusage at best or deception at worst.” Womack, 389 F.2d at 801. On the other hand, if Waste Stream took the contract qualifiers to heart and bid based on a truly unlimited range, the price likely would have been significantly higher. It is apparent from the evidence that estimates are needed in the waste industry in order to develop a reasonable and competitive bid. Notable is that fact that no other company submitted a bid.
Though the Commission now argues that the contract should be interpreted as being completely open ended, its position is not consistent with what appears to have been its initial intent. As discussed, it set the estimates based on a reasonable business plan. Per its statutory mandate, it needed a resource that could dispose of any and all sludge it produced. It clearly anticipated and estimated the volumes accurately, even though this was the Commission’s first time contracting in this manner. Several clauses were added based on its prior experience, providing it with an operational cushion.[40]
The record indicates that there were no material changes in the volume of raw sludge received from the towns during the contract. Any fluctuation had to come from processing changes within the facility, all within the control of the Commission. The contract volume estimates were accurate for the first eighteen months of the contract. The Commission’s ultimate decision to shut down the second incinerator for safety reasons was certainly made in good faith. It was the unpredictable and unforeseeable incinerator explosion that has created an issue.
As a result of the explosion, the sludge volume eventually expanded by 400%. This number far exceeds the variation seen in any other case. Even so, Waste Stream continued hauling. It could not take the chance that it would be in breach if it ceased doing so. However, it rightfully protested and gave proper notice to the Commission. On the other hand, the Commission was innocent in the events that led to the shutdown of the incinerators. Unfortunately, it was incorrect in its assessment of how to interpret the contract. Without question, the volume increase represents an unreasonably disproportionate change by any standard. Code Comment 2 literally applies here, indicating that “sudden expansion” of requirements is outside the scope of any contract. G.L.c. 106, §2-306. While public and private organizations must be mindful of their purses, fundamental elements of contract law cannot be ignored.[41]
The UCC and the cases make clear that estimates are meant to be center points around which reasonable variation may occur. Typical contract adjustments are given when variation exceeds the 15 to 20% range.[42] When applied to the center estimated number, the percentage factor generates a range of variation, for example from 80% to 120% of the center number using a 20% factor. In this case, the contract was one step ahead, setting a range for volume and both a center-point and a range for solids content. The range of 9,000 to 18,000 gallons reflects a variation factor of 33% around an average center point of 13,500. The range of 2-6% solids content represents variation factors 56% below and 33% above the given center point of 4.5%. These actual factors are generous compared to those interpolated by the case law. But, more importantly, these ranges and factors represent the understanding of the parties concerning the makeup of the waste to be hauled.
Massachusetts case law, federal case law and the UCC speak in unison in providing that reductions in quantity are acceptable if the decision to reduce is made in good faith, even to the point of discontinuing business. The facts of this case suggest that until relatively recently, there were very few days, if any, on which actual production went below the stated estimates. Though Waste Stream orally argued reduction relief during the hearing on the instant motion, this Court sees no reason to go against the weight of the law based on the facts of this case. The output reductions are not eligible for relief. However, any days that saw output increases above 18,000 gallons per day and/or solids content above 6% per day are eligible for relief under the contract.
C. Equitable Adjustment (Calculating Relief)
Contract-based relief from unreasonably disproportionate output is called equitable adjustment. G.L.c. 7, §421; District of Columbia v. Org. for Envtl. Growth, Inc., 700 A.2d 185, 203 (1997). Equitable adjustment is a process of “keeping the contractor *730 whole or maintaining the contractor’s profit or loss position as it was before the occurrence of the compensable event.” NATCO Limited Partnership, Eng. B.C.A. No. 6183, 1995 WL 732816, at *5 (Oct. 13, 1995). Equitable adjustments are “the difference between what it would have reasonably cost to perform the work as originally required and what it reasonably cost to perform the work as changed.” Id. at 203 (citations omitted).[43] The plaintiff bears the burden of proof of increased costs. Id.
D. Declaration Summary
The agreement made between the parties is a valid ten-year output contract which includes the ITB. The contract estimates of 9,000 to 18,000 gallons per day and 2 to 6% solids content set the boundaries of reasonableness. Any daily output that exceeds those ranges is per se unreasonably disproportionate. Waste Stream may recover its reasonable costs of disposing of output that does, in fact, exceed those ranges.
3. Breach of Contract
Waste Stream argues that it was forced to dispose of non-conforming sludge and to provide a significantly larger bond, and that the Commission has breached the contract. “A breach of contract is a failure to perform for which legal excuse is lacking.” When dispute resolution remedies exist under the contract, however, it is inappropriate to pursue a breach of contract claim as a first step; only an unjustified rejection of a claim under the contract would warrant recovery for a claim of breach of contract. Glynn v. City of Gloucester, 21 Mass.App.Ct. 390, 397 (1986); Sutton, 423 Mass. at 205, n.22. Public agencies must address such claims for relief in good faith. Sutton, 423 Mass. at 205. Given the declaration detailed above, the parties now have a contract-based remedy under which to resolve their differences. The breach of contract claim is premature. What lies here is a claim for relief under the contract.
The parties likely are able to calculate the appropriate relief faster and more efficiently than can the Court. If they are unable to do so within 120 days, either party may petition directly to the Court to schedule a hearing to determine relief. In calculating relief, the following principles are relevant: 1) Based on the output contract terms discussed above, the parties are to identify on which days the Commission put forth sludge that exceeded 18,000 gallons and/or 6% solids content. That is, the parties must first determine which days had unreasonably disproportionate increases in sludge quantity or quality. Decreases below stated estimates do not qualify for relief. 2) Any days that can be attributed to planned or unplanned maintenance should properly be accounted for up to the stated 25% increase level. Any amount above the 25% on those days is to be considered subject to relief. 3) Either party may then argue and must prove cost increases or decreases due to the disproportionate changes on the identified days. As per the case law, sludge excesses alone will not justify financial recovery. Actual cost increases/decreases must be proven. 4) The parties should report back to the Court only if the parties are not able to resolve their differences in 120 days.
4. Quantum Meruit and Unjust Enrichment
“Restitution is a common form of relief in contract cases. It has as its objective not the enforcement of contracts ..., but the prevention of unjust enrichment through the protection of [one’s] restitution interest.” Restatement (Second) of Contracts, Topic 4. Restitution, at 199 (1981). “A person who has been unjustly enriched at the expense of another is required to make restitution to the other. The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party.” Salamon v. Terra, 394 Mass. 857, 859 (1985) (citations omitted). Quantum meruit is thus a theory of recovery based on an underlying premise of one party’s unjust enrichment. A.J. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 793-4 (1986). To recover under quantum meruit, there can be no enforceable express contract, only an implied or quasi contract. Szalla v. Locke, 421 Mass. 448, 453 n.2 (1995).[44] The plaintiff must seek recovery for the “fair and reasonable value of his services.” Id. at 453. Unjust enrichment does not stand on its own as a method of recovery; it is part and parcel of recovery under quantum meruit.
Plaintiffs are only “entitled to one recovery for [] services [rendered].” Marshall v. Stratus Pharm,, Inc., 51 Mass.App.Ct. 667, 670 n.6 (2001) (citing Szalla, 421 Mass. at 454). “If the plaintiff is entitled to recover on a contract, he cannot recover in quantum meruit.” Id. The same conduct cannot justify double recovery. Szalla, 421 Mass. at 454.
Because Waste Stream may now recover by way of equitable adjustment and because it does not seek recovery based on any subsequent or different conduct beyond the excess production of sludge, there can be no recovery in quantum meruit. Waste Stream’s summary judgment motion must be denied as to the quantum meruit and unjust enrichment claims.
ORDER
For the reasons stated herein, the Plaintiffs Motion for Partial Summary Judgment is allowed in part and denied in part, as follows. Summary judgment is ALLOWED on Count I for Declaratory Judgment, and a declaration shall enter in accordance with Part D of this memorandum. Summary judgment is ALLOWED on Count II for Breach of Contract, now treated as a claim for relief under the contract. Summary judgment is DENIED on Counts IV and VII for Quantum Meruit and Unjust Enrichment, respectively.

Chapter 381, Acts and Resolves of Massachusetts, 1982.

Among other things, the Legal Notice informed bidders of when and where they could obtain the project Specifications.

The Court refers to the package given to bidders generally as the “bid solicitation package.” However, the project documents refer to this group of materials in several ways, including “Procurement Documents,” “Specifications,” and “Contract Documents.”

The addenda are titled “CONTRACT DOCUMENTS ADDENDUM No. 1 and No. 2.” They state that, at issuance, they modify the “Procurement documents” and take precedence over any earlier contradictory information. Addendum No. 1 states that the average solid liquid concentration of the waste water is 4.5%. Addendum No. 2 confirms that contractors must provide disposal services for all plant residuals. The parties both agree that the addenda are part of the contract.

The contract states: FIRST: The (Contractor) agrees to furnish to the Commission the following: AS PER SPECIFICATIONS AND BID. The (Contractor) further agrees that (he) (it) will strictly comply with the specifications, [sic] requirements and (his) (its) bid prepared therefor and annexes hereto and made part thereof. SECOND: The Commission agrees to pay to the (Contractor) as follows: AS PER SPECIFICATIONS AND BID.

Addendum No. 1 is the only source stating the sludge average of 4.5%, superceding any earlier contrary information. Though not stated in the addendum itself, this number was calculated by an employee who researched the daily readings for the previous three years, and averaged the data to produce this annual rate that was consistent for the three years prior to bid.
This number was calculated in advance of the question being asked, due to an employee’s expectation that bidders would need this information in addition to the range estimates in order to properly prepare a bid. The employee was experienced in the industry.

No volume estimates were provided for cake, as the Commission did not anticipate having cake hauled away. The Commission made a business decision that having 9,000 to 18,000 gallons of secondary sludge removed would optimize their operations.

Primary sludge with more solids makes better cake. Better cake optimizes the incinerator burning operation. Removal of secondary sludge by contract hauling would free the Commission to focus on the dewatering and incinerating processes, for which they were best equipped in 1996.
Prior to contracting with Waste Stream, the Commission had only contracted to remove cake, not liquid. The previous hauler was having difficulty disposing of the cake. The Commission decided to optimize its operations, and solicited bids for a long-term contract focused on the removal of secondary sludge. It anticipated cost savings from a long-term agreement and from focusing on doing what it did best, which was to make and burn cake. The Commission inferably excused its previous hauler from the parties’ contract.

Because the solids generally weigh more than the liquids, pricing by weight inherently accounts for varying solids content

This approach appears inherently to side-step the issue of varying solids content, because the more solids there are in the sludge, the greater the disposal cost at the final facility.

Waste Stream was actually the only bidder, though at least eight companies were represented at the August 1996 pre-bid meeting.

The letter states: “Further, please be advised that it is WSE’s intention to respond completely and without reservation to all aspects of the City’s specification. Any aspects of WSE’s bid which do not conform to the City’s specification shall be considered an oversight and may be disregarded [sic] by the City." The parties consider this letter part of the bid and the contract.

Each truckload capacity is 9,000 gallons, though not every load carries that full quantity. The estimated volume range represents 1 to 2 truckloads per day. Volumes are measured per truck and then totaled into a daily volume. The solids content is tested by truckload; the results from every three trucks are rolled into one composite percentage. The composite numbers are then averaged daily. The measuring is done primarily by the facility operator, U.S. Filter, who is not a party to this suit.

The parties agree that neither shutdown was for maintenance, thus the 25% maintenance clause was not invoked.

No dewatered cakes were produced because no incinerator was available to burn them.

The precise variation in solids is difficult to discern from the evidence, but both parties acknowledge that the average was greater than 4.5%.

The ITB indicates that the bond must be in the amount of 100% of the total first-year bid amount. The 1TB also set the first-year bond at $600,000. The ITB alone states that the bonding level must be adjusted annually, based on the previous year’s contract dollar volume. The volume in 1999 was $2,500,000, thus setting the bond for 2000 at over four times the size of the first year. Addendum No. 1 references and confirms this ITB-based requirement.

It is unclear how much effort, if any, was put into resolving these differences.

Research indicated that when the sludge has a content of 6% or higher, the Commission is actually saving money compared to the open market, due to the fact that the contract is by volume, not weight. If disposal was by weight, sludge over 6% would cost the Commission more than the Waste Stream contract rate. Given these high volume conditions, the annual savings to the Commission would be roughly $500,000.

This Court is aware of numerous deposition and affidavit statements regarding which documents are part of the contract. Any of those which are conclusory are not considered as evidence here, as they would not raise genuine issues of material fact.

See also Global Network Tech, Inc. v. Reg’l Airport Auth. of Louisville and Jefferson County, 122 F.3d 661 (8th Cir. 1997) (generally interpreting the invitation as part of the contract).

Bid responsiveness to the invitation is also important to avoid ambiguity when courts are asked to “conduct autopsies on poorly written agreements.” Firth, 36 Fed.Cl. at 274 (citation omitted).

In addition, the Bid Sheet completed by Waste Stream states that the bidder must meet all specifications and conditions.

Because the ITB is incorporated by operation of law into the contract via the bid, neither the possible ambiguity of the term Specification nor the lack of express incorporation into the contract are material to the resolution of this case.

In its motion, Waste Stream represented the ITB to be part of the “Contract Specification” which was “incorporated into the Contract.”

“[A] contracting party’s objective intention dictates and a party is bound by its outward manifestations to the other party.” Polaroid, 416 Mass. at 696-97.

Because “goods" are defined as all things movable under the UCC, a question could be raised regarding the applicability of the common law or the UCC in this case. G.L.c. 106, §2-102. In assessing whether a contract is for goods or services, the critical question is whether the predominant factor is delivery of service, or whether it is essentially a sale of goods with incidental services. The record presents no indication of an interest in sludge as a product, only in the *732 service of disposal. The contract here is thus deemed to be one for services. See also Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co., 25 Mass.App.Ct. 530, 534 (1988) (distinguished on other grounds) (discussing the goods versus services assessment).

This Court identified six opinions of the Supreme Judicial Court and Appeals Court which interpret requirements contracts, three of which were issued prior to the Massachusetts enactment of the UCC in 1958. G.L.c. 106, §1-101. See Mishara Constr. Co., Inc. v. Transit-Mixed Concrete, Inc., 365 Mass. 122 (1974); Neofotistos v. Harvard Brewing Co., 341 Mass. 684 (1961); Royal Paper Box Co. v. E.R. Apt Shoe Co., 290 Mass. 207 (1935); Brodsky v. Morrill Co., 237 Mass. 86 (1921); Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283 (1902); Associated Credit Serv., Inc. v. City of Worcester, 33 Mass.App.Ct. 92 (1992).
One relevant Superior Court case was found. While the Court there did assess a requirements service contract, it is distinguishable from the case at bar on four grounds. Falcucci Constr. Co, Inc. v. Boston Water and Sewer Comm., Civ. No. 974909, 1998 WL 1181178 (Middlesex Super. Sept. 18, 1998) (Sosman, J.) (9 Conn. L. Rptr. 151). The suit was for recovery on quantities below stated estimates; the contract had qualifiers similar to the case at bar. First, the contract was for emergency repair services, where the exact number of events is difficult to predict. Second, the contractor had prior experience and knew that the actual number of yearly events was much lower. TJfird, the contract addressed increased quantities, but not decreases, implying a purposeful intent to leave diminished quantities open-ended. And fourth, the case law usually allows for diminished performance, with no price adjustments, in similar unit-price contracts (discussed infra).

Common-law cases are governed by analogous UCC principles when the UCC evolved from considerations comparable to those in the common law. Brewer v. Poole Constr. Co., No. Civ. A. 98-0924B, 2001 WL 792783, at *4 (Super.Ct. May 3, 2001) (Welch, J.) (13 Conn. L. Rptr. 97). UCC-based, output/requirement contract law developed from the common law in the early twentieth century. Lord, supra §7:12, at 196-200.

Requirements/output contracts are often compared to indefinite quantity contracts, which have no exclusivity but must have guaranteed minimum purchases. Schweiger Constr. Co. v. U.S., 49 Fed.Cl. 188, 194 (2001); Coyle, 1997 WL 8496 at *6.

The Code states: (1) A term which measures the quantity of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements maybe tendered or demanded. G.L.c. 106, §2-306.

Comparatively, the government can be sued for negligent estimating in output contracts, an easier burden for the plaintiff compared to indefinite contracts which carry a lower standard for the estimator, one that makes it more difficult for the plaintiff to prove. Schweiger, 49 Fed.Cl. at 197. Thus, government agencies that are parties to output/requirements contracts are held to a comparatively higher standard to credibly provide estimates.

The Orange Court suggests that the following factors be considered: (1) the amount by which the requirements exceed the contract estimate; (2) whether the seller had any reasonable basis on which to forecast or anticipate the requested increase; (3) the amount, if any, by which the market price of the goods in question exceeded the contract price; and (5) the reason for the increase in requirements. Orange, 397 N.Y.S.2d at 819. The Court found an overage of 100% to be unreasonable. Id. at 821.

The Massachusetts cases identified earlier all deal with quantity reductions, not increases.

Common law held that “the seller assumes the risk of all good faith variations in the buyer’s requirements even to the extent of a determination to liquidate or discontinue the business.” Empire Gas, 840 F.2d at 1337-38 (citations omitted).

UCC §2-306 Comment 2 indicates that good faith variations are acceptable even to the extreme of discontinuance. In contrast, Comment 3 discusses estimates as a center of variation, relative to quantities that may be demanded. Courts interpret this tension to justify using estimates for increases and good faith for decreases. Empire Gas, 840 F.2d at 1338.

A bad faith situation would exist if a market price rises above the contract price, and a consumer/buyer “demand[s] more goods than it truly needs [from the producer/sellerl in order to resell them for the better market price.” Atlantic Track, 989 F.2d at 544.

Massachusetts added a requirement of good faith to its version of the UCC, defined as “honesty in fact in the conduct or transaction concerned,” falling short of actual fraud. G.L.c. 106, §§1-201(19) and 1-203. This addition reinforces the Commonwealth’s public policy commitment to reliance on good faith in contracting.

These facts are different from those in the heavily criticized holding in Crown Laundry, where the facts supported neither a requirements nor an indefinite contract, yet the Court still implied a requirements contract. Crown Laundry, 29 Fed.Cl. at 518. In the alternative, the Court would have been forced to find the contract invalid. Id. at 517. Here, the facts clearly meet all of the elements of an output/requirements contract.

Specifically, the qualifiers to substitute primary sludge or cake, and the bid request for all three iypes of sludge harkened to the prior contract.

Evidence of sludge solids content variation is unclear in the record, though the parties agree that the average exceeded 4.5%. This Court makes no determination on liability based on variation of the solids content at this time.

There are examples of far greater variation as well, while the federal contracts all employ a 15% factor.

“But a contractor who has underestimated his bid may not properly use a change order as an excuse to shift his own risks or losses to the government.” District of Columbia, 700 A.2d at 203. The intent is to maintain the contractor’s profit or loss position, and not have him recover for pre-existing contract losses. Gulf, 1993 WL 491474, at * 1014 (discussing several factual situations that did not qualify as recoverable costs due to unreasonable variation).

Parties may recover for quantum meruit when the contract has been terminated (i.e., there is no longer a contract), even if it is against the Commonwealth. Sullivan v. Commonwealth, 397 Mass. 789, 796 (1986); Peabody N.E., Inc. v. Town of Marshfield, 426 Mass. 436, 442 (1998) (granting claim against town for quantum meruit because late performance had precluded recovery under the contract).
Though this Court denies the claim for quantum meruit, it is not based on the two cases cited by the Commission. One refers to the state not being a person in trade under G.L.c. 93A. All Seasons Services, Inc. v. Comm. of Health and Hosp. of Boston, 416 Mass. 269, 272 (1993). The other refers to recovering under statutory requirements before legal suit. United States Leasing Corp. v. City of Chicopee, 402 Mass. 228, 231-32 (1988). While both cases are still good law, neither applies to this case.